IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MARIA CANALES and M SQUARED STRATEGIES, INC., <br><br> Plaintiffs, <br><br> v. <br><br> HENRY M. PAULSON, SECRETARY OF THE UNITED STATES DEPARTMENT OF TREASURY, *et al.*, <br><br> Defendants. | Civil Action No: 1:06CV01330 (GK) |

## PLAINTIFFS' APPLICATION FOR PRELIMINARY INJUNCTION

COME NOW Plaintiffs MARIA CANALES ("Canales or "Ms. Canales") and M SQUARED STRATEGIES, INC. ("M Squared") (collectively, "Plaintiffs"), by and through their undersigned counsel, and apply, pursuant to Fed. R. Civ. P. 65(a) and LCvR 65.1(c), for this Court to issue an order enjoining the Defendants and any other agency or individual acting on behalf of the United States Government (the "Government") from enforcing debarment notices issued by the United States Department of the Treasury ("Treasury") to Plaintiffs, respectively. In support thereof, Plaintiffs state as follows:

### I.   INTRODUCTION

This case arises from the June 27, 2006 debarments of Plaintiffs by Treasury. The debarment of M Squared is void *ab initio*, because it is based solely on an imputation theory that is expressly prohibited by the applicable FAR regulation, 9.406-5 (Scope of Debarment), regardless of the putative validity of the separate debarment notice sent to Canales. Debarment of an individual principal of a contractor may only be imputed to a corporate contractor "when the conduct occurred in connection with the individual's performance of duties for or on behalf

- 1 -

of the contractor," an undisputed factual impossibility in this case. Should the Government be permitted to enforce the patently invalid debarment of M Squared, M Squared will suffer irreparable harm to its business by the loss of all of its contracts; it will be destroyed and will cease to exist.

Likewise, the debarment against Canales is void. The bases for the debarment of Canales clearly show that Treasury was attempting to punish Canales or that the debarment was issued in an attempt to conceal Treasury's false statements made in two separate semi-annual reports to Congress, which are both improper purposes for debarment of a contractor. Furthermore, Treasury had no jurisdiction to issue the debarment as Canales was never a government contractor to Treasury or any other government agency. Finally, the debarment of Canales is invalid as there is no legal or factual nexus between the conduct of Canales cited in the debarment notice and the debarment action itself. Canales will also suffer irreparable harm if the Government is permitted to enforce the debarment because Canales' business reputation will be ruined, and she will not be able to pursue her career in government contracting.

## II.    **BACKGROUND FACTS**

Canales was employed by Treasury between June 1999 and October 2002 and worked in various capacities and positions, which culminated in the dual positions of Acting Chief Information Officer and Acting Deputy Assistant Secretary. (Affidavit of Maria Canales dated July 28, 2006 ("Canales 7/28 Aff.") at ¶ 2, a copy which is attached hereto as Exhibit 1; Declaration of Maria Canales ("Canales Decl.") at ¶ 2, a copy of which is attached hereto as Exhibit 2). On June 6, 2002, the Office of Inspector General of Treasury ("OIG") interviewed Canales about gifts she received from an individual who acted as a consultant, John M. Neal ("Neal") (Canales 7/28 Aff. at ¶ 3). During the interview, Canales answered questions about her

relationship with Neal and any gifts he had given her. (Canales 7/28 Aff. at ¶ 4). Canales stated that Neal gave her a vase of indeterminate value, which she stated she would return if OIG deemed such action appropriate. (*Id.*) Canales further stated that she declined to receive several small loose emeralds offered to her by Neal. (*Id.*). Immediately following the interview, OIG personnel assisted Canales, who was unrepresented by counsel, with incorporating her statements into an affidavit that she then executed (the "OIG Affidavit"). (Canales 7/28 Aff. at ¶ 5; Compl. at ¶ 11).

Late in October 2002, Canales voluntarily resigned as an employee of Treasury to open her own business to provide technology consulting services. (Canales 7/28 Aff. at ¶ 6; Canales Decl. at ¶ 3). Her resignation was in no way related to the OIG interview. (Canales 7/28 Aff. at ¶ 7). In January 2003, Canales started M Squared, a technology consulting services company. (Canales 7/28 Aff. at ¶ 8; Canales Decl. at ¶ 4). In 2003, M Squared had contracts in the private sector only. (Canales 7/28 Aff. at ¶ 9; Canales Decl. at ¶ 5).

On April 13, 2004, a one-count Information was filed against Canales charging her with the misdemeanor of Making a False Writing in violation of 18 U.S.C. § 1018 in connection with the OIG Affidavit. (Canales 7/28 Aff. at ¶ 10; Canales Decl. at ¶ 6). On April 19, 2004, six days later, Canales voluntarily pleaded guilty to the misdemeanor offense for falsely stating in the OIG Affidavit that she did not receive emeralds (valued at $800) from Neal. (Transcript of Arraignment Hearing at p. 11-12, a copy of which is attached hereto at Exhibit 3; Canales 7/28 Aff. at ¶ 11; Canales Decl. at ¶ 7).

At the Arraignment Hearing, counsel for Canales made clear in the record that there was "no connection proffered by the United States Attorney's office that connects any procurement" to the gifts received by Canales from Neal. (Transcript of Arraignment Hearing at pp. 13).

Counsel's statement, with the acquiescence of the Assistant United States Attorney, Howard Sklamberg ("Sklamberg") was accepted by the Magistrate Judge. (Transcript of Arraignment Hearing at pp. 13-14). Further, the Assistant United States Attorney read into the record, at the July 13, 2004 Sentencing Hearing for Canales, that Canales's plea had nothing to due with any "bribery or gratuity laws or corruption offenses." (Transcript of Sentencing Hearing at p. 5, a copy of which is attached hereto at Exhibit 4),

Sklamberg expressly noted at Canales' Sentencing Hearing that, "although this case stems from an investigation by the [Treasury's] Inspector General's Office into activities of Ms. Canales[,] [t]here ended up being no allegation that Ms. Canales broke any of the bribery or gratuity laws or corruption offenses." Sklamberg went on to circumscribe the limited misconduct charged against Ms. Canales. Although Ms. Canales was cleared of the more serious charges investigated by OIG, "[I]n the course of the investigation, however, Ms. Canales made a false written statement to the Inspector General . . ."). *(Id.)*

In April 2004, M Squared transitioned from private sector contracts to contracting solely with various Government agencies. (Canales 7/28 Aff. at ¶ 12; Canales Decl. at ¶ 8). In August 2004, M Squared sought to obtain a Government prime contract from the United States Department of Energy (the "DOE"). (Canales Decl. at ¶ 8). M Squared obtained its first prime contract with the Government (the DOE) in September 2004. Since 2004, M Squared has had contracts with the Department of Veterans Affairs (the "DVA"), the DOE, and the Small Business Administration. (Canales 7/28 Aff. at ¶ 13).

As part of the solicitation process for any Government contract in which M Squared participates, M Squared discloses any and all prior disbarments, suspensions and convictions of any of its principals. (Canales Decl. at ¶ 11). All of the federal agencies with which M Squared

contracted from 2004 to the present knew of Canales' prior misdemeanor conviction, as she disclosed her conviction in the "Representations and Certifications" section on all applications for government contracts. (Canales Decl. at ¶ 12). Canales, as an individual, has never applied for or obtained a government contract. (Canales 7/28 Aff. at ¶ 14; Canales Decl. at ¶ 14). M Squared and Canales do not have, have never had, nor have ever applied for any government contracts with Treasury. (Canales Decl. at ¶15 ).

On April 30, 2004, apparently unsatisfied with the conclusions of the U.S. Attorney's investigation, Defendant Dennis S. Schindel, Acting Inspector General of the Department of Treasury ("Schindel"), published to Congress a false account of the investigation conducted by OIG. (*See* the Department of the Treasury Office of the Inspector General's Semiannual Report To The Congress for the period October 1, 2003 - March 31, 2004 (the "October-March Report," a copy of the relevant portion of the October-March Report is attached hereto as Exhibit 5). The October-March Report *falsely stated* that, "[Canales], as part of or in exchange for a $5.8 million contract for cyber-security related software and consulting services, ... directed the contractor to place a $1.5 million subcontract with a company owned by a friend of [Canales].... [I]n return, [Canales], received various gratuities including jewelry and use of a time-share rental property located in the Bahamas. *The former CIO agreed to ... be debarred from doing business with the federal government for life.*" (The October-March Report at p. 15) (emphasis added).

At the time of Treasury published the October-March Report, neither Canales nor M Squared was a government contractor. Furthermore, Canales's misdemeanor conviction, as Treasury knew or should have known, had absolutely nothing to do with her receipt of any gratuities or taking any bribes. Indeed, Ms. Canales had been expressly cleared of such

allegations of wrongdoing by the United States Attorney's Office. (*See* Transcript of Sentencing Hearing (Exhibit 4) at p. 5.

Incredibly, on October 29, 2004, apparently still unhappy with the conclusions of the U.S. Attorney's investigation, Schindel reiterated the false statements regarding Canales in the Department of the Treasury Office of the Inspector General's Semiannual Report To The Congress for the period April 1, 2004-September 30, 2004 (the "April-September Report," a copy of the relevant portion of the April-September Report is attached hereto as Exhibit 6). Schindel again stated that Canales "directed a consulting firm under contract with [Treasury] to secure a $1.5 million subcontract with a company owned by the [Canales'] friend, as a part of (or in exchange for), a $5.8 million contract that Treasury awarded to the consulting firm. [Treasury's] investigation revealed [that Canales] accepted various gratuities including jewelry and the use of a time-share rental property. *[Canales] … has been debarred for life from doing business with the federal government.*" (*Id.* at 19) (emphasis added).

The statements regarding Canales in the October-March Report and April-September Report were false at the time they were made, and Treasury knew or should have known they were false. Ms. Canales had been cleared of the serious allegations of "bribery or gratuity laws or corruption offense" By the Unites States Attorneys' Office. Treasury had no pending debarment proceedings against Ms. Canales at that time. Indeed, Treasury had never even initiated debarment proceedings against Ms. Canales until nearly two years after the OIG's first false report to Congress in April 2004. (*See* Letter from Treasury to Canales, dated November 29, 2005 ("Debarment Initiation Letter," initiating debarment proceedings, a copy of which is attached hereto as Exhibit 7). As of the respective dates of the October-March Report and the April- September Report, there was no conviction of Canales with regard to any Government

procurement, *no information or indictment* filed by the Government against Canales for improperly accepting gratuities, and Canales had, in fact, not been debarred from doing business with the Government for any length of time, let alone "for life."

On November 29, 2005, nineteen months after Treasury's OIG first falsely notified Congress of Canales' alleged "lifetime debarment," Treasury apparently attempted to cover-up OIG's false statements by hurriedly commencing an "after the fact" debarment proceeding. (*Id.*) Then, on June 27, 2006, Defendant Thomas A. Sharpe, Jr., the Debarring Official for Treasury ("Sharpe"), issued letters to Canales (the "Canales Debarment Notice) and M Squared (the "M Squared Debarment Notice"), respectively, (collectively, the "Debarment Notices") debarring Canales and M Squared from participating in procurement "throughout the executive branch of the Government." (Canales 7/28 Aff. at ¶ 15; Canales Decl. at ¶¶ 19-20). The Debarment Notices stated that debarment was to be effective for three years, commencing with an effective date of June 27, 2006. (*Id.*)

The Debarment Notices did not contain any factual findings or cite any jurisdictional basis for the decision to debar. (*Id.*) Sharpe extended the debarment to M Squared despite the fact that M Squared has never been charged with or convicted of, any fraudulent, criminal, or other seriously improper conduct. (Canales Decl. at ¶ 16). In fact, no officer, director, shareholder, partner, employee, or other individual associated with M Squared has ever been charged with, or convicted of, any fraudulent, criminal, or other seriously improper conduct as a government contractor or a private contractor for conduct that occurred in connection with the individual's performance of his/her duties for or on behalf of M Squared, or with M Squared's knowledge, approval, or acquiescence. (Canales Decl. at ¶ 17). Prior to the Debarment Notices, none of these agencies ever had or currently had any issue with M Squared's (or its officers' or

employees,' including Ms. Canales') present responsibility or performance as a government contractor. (Compl. at ¶ 24; Canales Supp. Aff. at ¶ 3; Canales Decl. at ¶18).

However, M Squared has already suffered irreparable harm to its business as a result of the Treasury debarment notice. M Squared had a subcontract with HPTi in the DVA for three and a half people, which was terminated on July 31, 2006, solely as a result of M Squared Debarment Notice. (Canales Decl. at ¶ 21).

Unless enjoined, M Squared will continue to suffer irreparable harm to its business, as follows:

    A.    M Squared currently has a prime contract with the DVA for nine people. (Canales Decl. at ¶ 22). This contract is funded through September 30, 2006, but M Squared has to inform the DVA by mid-August if the debarment has been resolved or enjoined. (*Id.*) If the debarment has not been resolved or enjoined by August 15, the DVA will then transition the work from this contract to another contractor. (*Id.*)

    B.    M Squared currently has a prime contract with the DOE IOA&T for two people. (Canales Decl. at ¶ 23). This contract is funded through September 30, 2006, but M Squared has to inform the DOE by mid-August if the debarment has been resolved or enjoined. (*Id.*) If the debarment has not been resolved or enjoined, the DOE will then transition the work from this contract to another contractor. (*Id.*)

    C.    M Squared currently has a prime contract with the DOE I-Manage for two people. (Canales Decl. at ¶ 24). This contract is funded through November 15, 2006, but M Squared has to inform the DOE by September if the debarment has been resolved or enjoined. (*Id.*) If the debarment has not been resolved or enjoined, the DOE will then transition the work from this contract to another contractor. (*Id.*)

If M Squared loses these contracts, M Squared will be destroyed and go out of business. (Canales Supp. Aff. at ¶ 6, Canales Decl. at ¶ 25). Additionally, Canales' business reputation will be destroyed if the Government is permitted to enforce the debarment against her (Canales 7/28 Aff. at ¶ 22; Canales Decl. at ¶ 26).

The government agencies with which M Squared has contracts will not suffer any harm (much less, substantial harm) if the Government is restrained and enjoined from enforcing the debarment. (Canales 7/28 Aff. at ¶ 23). Rather, those agencies will benefit from such an order because it will save them the time, expense, and loss of resources from the work disruption that will ensue in finding a new contractor to perform the same work that M Squared is currently performing satisfactorily. (*Id.*)

### III. STANDARD OF REVIEW

In deciding whether to grant a preliminary injunction, the Court must consider four factors: (1) whether Plaintiffs will suffer irreparable injury in the absence of an injunction; (2) whether there is a substantial likelihood of success that the Plaintiffs will succeed on the merits of their claims; (3) whether an injunction would be in the public interest, or at least not be adverse to public interest; and (4) the harm to Defendants. *See Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1317-18 (D.C. Cir. 1989); *Washington Metro Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C. Cir 1977); *Milk Indus. Found. v. Glickman*, 949 F. Supp. 882 888 (D.D.C. 1996).

Plaintiffs ultimately need not prevail on each of these factors. *See Holiday Tours,* 559 F.2d at 843-45. Indeed, "[i]f the arguments for one factor are particularly strong, an injunction may issue even if the arguments in other areas are rather weak." *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995). Thus, this court may grant injunctive

relief where Plaintiffs can show a "high probability of success and some injury, or vice versa." *Cuomo v. United States Nuclear Regulatory Comm'n*, 772 F.2d 972, 974 (D.C. Cir. 1985).

## IV. ARGUMENT

### A. THE DEBARMENT OF M SQUARED IS VOID AS A MATTER OF LAW AND THIS COURT SHOULD ENJOIN THE GOVERNMENT FROM ENFORCING THE M SQUARED DEBARMENT NOTICE.

1. Because the Debarment of M Squared is Void, there is a Substantial Likelihood of Success that M Squared will Succeed on the Merits of its Claims.

The sole ground cited as support for the debarment of M Squared is the debarment of Ms. Canales. (*See* the M Squared Debarment Notice, Exhibit F to Canales Decl.). According to Sharpe, because Canales is currently a "principal" in M Squared, as defined by FAR 52.209-5(a)(2), and because Canales was convicted of making a false written statement in violation of 18 U.S.C. § 1018, M Squared is automatically debarred from contracting with the Government. As a matter of law, the debarment of M Squared is therefore contrary to the FAR regulations and void on its face.

Debarment on such an imputation is clearly improper here. FAR 9.406-5(a), Scope of debarment, provides:

> The fraudulent, criminal, or other seriously improper conduct of any officer, director, shareholder, partner, employee, or other individual associated with a contractor may be imputed to the contractor when the *conduct occurred in connection with the individual's performance of duties for or on behalf of the contractor*, or with the contractor's knowledge, approval, or acquiescence.

(emphasis added). Accordingly, a present contractor may not be debarred based on past misconduct of a principal outside of her employment with the contractor.

It is undisputed that the conduct underlying Canales' misdemeanor conviction did not occur in connection with Canales' performance of duties for or on behalf of M Squared. The

conduct occurred when Ms. Canales was an employee of Treasury, not M Squared. M Squared was not even in business, and had never obtained or performed any contracts with the Government, at the time Canales made the false written statement in June 2002. (*See* Canales Decl. at ¶ 2). Accordingly, the debarment of M Squared by imputation is clearly contrary to law and void.[1]

Moreover, there is nothing in the FAR provision cited by Sharpe in the M Squared Debarment Notice that provides a basis for Treasury to debar M Squared based on Ms. Canales' debarment. Rather, the section of FAR cited by Sharpe in the Canales Debarment Notice, 52.209-5(a)(2), merely defines the definition of "principal" for the purposes of certifications in solicitations where the contract value is expected to exceed a certain dollar amount. There is simply no mention of cause for debarment in FAR 52.209-5(a)(2), and Treasury has no basis in law for debarring M Squared. Indeed, M Squared has properly completed its certifications required by FAR 52.209-5(a)(2) by disclosing Ms. Canales' misdemeanor conviction, and, notwithstanding such disclosure, the DOE and DVA, among other Government agencies, have awarded M Squared contracts that M Squared is currently fulfilling. (Canales Decl. at ¶¶ 22-24).

Given that there is no basis in law for debarring M Squared, the only explanation that Plaintiffs can find for the debarment of M Squared is to penalize M Squared for its affiliation with Ms. Canales or to retroactively "repair" or cover-up OIG's false statements published to

---

[1] Even "past misdeeds" by an agent of the contractor while employed by the contractor at the time of the "misdeeds" is not grounds by itself for debarment if the contractor is "presently responsible." *See Robinson v. Cheney*, 876 F.2d 152, 159-160 (D.C. Cir. 1989) (stating that "the Government must be able to fulfill its statutory duty of dealing only with responsible contractors…," but that a contractor with an agent who has performed "past misdeeds" may still be able to show that it is presently responsible because "the ultimate inquiry as to 'present responsibility' relates directly to the contractor itself, *not the agent or former agent personally responsible for its past misdeeds*") (emphasis added). In this case, however, the "past misdeeds" did *not* occur while Ms. Canales was employed by M Squared.

Congress. Such explanations, however, are clearly contrary to the underlying principles of debarment. "The serious nature of debarment and suspension requires that these sanctions be imposed only in the public interest for the Government's protection and *not for the purposes of punishment*." FAR 9.402(b) (emphasis added).

Thus, even under the heightened standards expressed in the Administrative Procedure Act regarding a judicial review of an agency's decision to debar, *i.e.*, that the decision to debar must be "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law" in order for a court to reject the decision, Treasury's decision to debar M Squared must be enjoined and overturned. *See* 5 U.S.C. § 706(2)(A). Indeed, there is simply no rational basis or any evidence to support the debarment of M Squared. *See Caiola v. Carroll*, 851 F.2d 395, 398 (D.C. Cir. 1988). Consequently, there is a substantial likelihood of success that M Squared will succeed on the merits of its claim that the debarment of M Squared is invalid as it is "arbitrary, capricious, an abuse of discretion and not in accordance with law".

    2.    <u>M Squared Will Suffer Irreparable Harm if the Government is Permitted to Enforce the M Squared Debarment Notice.</u>

To demonstrate irreparable harm if an injunction does not issue, a plaintiff must show that the harm it faces is imminent and certain, rather than remote and speculative. *Trudeau v. Fed. Trade Comm'n*, 384 F. Supp. 2d 281, 297 (D.D.C. 2005); *see also Wisconsin Gas Co. v. FERC*, 244 U.S. App. D.C. 349, 758 F.2d 669, 674 (D.C. Cir. 1985) ("the injury must be both certain and great; it must be actual and not theoretical"). Purely financial harm that can be recovered after a full trial on the merits is not "irreparable" – the harm must be one for which there is no other adequate remedy at law. *Id.* Economic harm rises to the level of irreparable harm where it threatens the "very existence of [plaintiffs'] business." *Patriot Inc. v. U.S. Dep't of Hous. & Urban Dev.*, 963 F. Supp. 1, 5 (D.D.C. 1997).

In the instant case, there is no speculation involved; M Squared will lose its only remaining contracts if the Government is not enjoined from enforcing the M Squared Debarment Notice. (Canales Decl. at ¶¶ 22-24). If the Government is not so enjoined, because M Squared has no other business than its current government contracts, M Squared will be forced to terminate all of its employees, close its offices, and cease to exist. (*Id.* at ¶ 25).

In *Patriot*, this Court found that unless it granted an injunction, the plaintiffs would be barred from the reverse mortgage market. *Patriot*, 963 F. Supp. at 5. Notably, in *Patriot*, this Court determined that the plaintiffs would suffer irreparable harm even though the plaintiffs could find business in other markets within the mortgage industry. *Id.* This Court still found that, because the plaintiffs would be barred from one particular market in an entire industry, they would suffer irreparable harm. *Id.* Similarly, without its current contracts and if its wrongful debarment is enforced, M Squared will be destroyed. (*See* Canales Decl. at ¶ 25). M Squared simply has no business other than its government contracts. (*Id.*)

3.  <u>An Injunction Enjoining the Government from Enforcing the M Squared Debarment Notice is in the Public Interest</u>.

Not only will it cost two federal agencies time and resources to transition M Squared's contracts to other contractors, but for the reasons stated above, the Government has a compelling interest in ensuring that when debarments issue, they issue to debar unscrupulous contractors for criminal or dishonest conduct relating to government contracts or procurement and not to punish an agency's former employee. *See* FAR 9.402(b); *Robinson*, 876 F.2d at 160.

4.  <u>There is no Harm to the Government if it is Enjoined from Enforcing the M Squared Debarment Notice</u>.

There is no harm to the Government if an injunction is issued, because the Government agencies currently contracting with M Squared will avoid a disruption in services with which

they have no desire to change. Indeed, these agencies will be harmed if an injunction is not issued as they will have to expend additional time and resources in order to address needs that are currently being met by M Squared. Moreover, the Government agencies (unlike Treasury, with which neither Plaintiff has even contracted with) currently contracting with M Squared have done so with the knowledge of Canales' misdemeanor conviction, and apparently decided that they would not be harmed by awarding such contracts to M Squared. (Canales Decl. at ¶¶ 11-13).

Based on the forgoing, this Court should enjoin the Government from enforcing the debarment of M Squared. Indeed, Treasury's debarment of M Squared was issued improperly, thereby making it void *ab initio*, such that there is a substantial likelihood that M Squared will succeed on the merits of the litigation. It is clear that M Squared will suffer irreparable injury if no injunction is issued, as it will go out of business and cease to exist. Moreover, M Squared meets the final two prongs of the test to determine whether an injunction should be granted because it is in the public interest to ensure that debarment is not used to penalize contractors, and the Government will not suffer any harm if the injunctive relief is granted.

B. **THE DEBARMENT OF CANALES IS VOID AS A MATTER OF LAW AND THIS COURT SHOULD ENJOIN THE GOVERNMENT FROM ENFORCING THE CANALES DEBARMENT NOTICE.**

1. <u>Because the Debarment of Canales is Void, there is a Substantial Likelihood of Success that Canales will Succeed on the Merits of her Claims</u>.

The Canales Debarment Notice is void as a matter of law because it is issued without any basis in fact or law. In the Canales Debarment Notice, Sharpe relies on two provisions of the FAR for support in finding that Canales should be debarred: FAR 9.406-2(a)(5), and FAR 9.406-2(a)(1). Neither provision, however, provides Treasury with a basis for debarring Canales.

FAR 9.406-2(a)(5) provides that a contractor may be debarred for commission of any offense "indicating a lack of business integrity or business honesty that seriously and directly affects the *present responsibility* of a Government contractor...." (emphasis added). Canales' misdemeanor conviction for statements made when she was an employee at Treasury is wholly unrelated to her performance as a Government contractor, to the extent that Canales is even a contractor in the first place. As noted, Canales has never applied for or obtained a government contract as an individual. (*See* Canales Decl. at ¶ 12). Additionally, the false written statement that forms the basis of the misdemeanor conviction was made well before M Squared even commenced business and two years before M Squared was awarded its first prime government contract. (Canales 7/28 Aff. at ¶ 5). Moreover, Treasury lacks the jurisdiction to debar either Plaintiff as neither M Squared nor Canales have ever had or applied for *any* contracts with Treasury *at any time, past or present*. (*See* Canales Decl. at ¶ 13) (emphasis added).

Plaintiffs have not uncovered any case in any jurisdiction where a government agency debars a contractor with which it does not conduct any business. Indeed, it is illogical to suggest that a Government agency with whom a contractor does not have any business may debar that contractor, notwithstanding the fact that the contractor currently maintains Government contracts with other agencies that are fully aware of the alleged grounds for debarment, as is this case here. (*See* Canales Decl. at ¶¶ 11-13, 18). Treasury simply cannot have knowledge of the present responsibility of the contractor (which, in this case, is M Squared, not Canales), because it does not have any business with M Squared (or Canales). *See Robinson* 876 F.2d at 160. Therefore, Treasury cannot rely on FAR 9.406-2(a)(5) as a sound basis for debarring Canales. *See id.*

Similarly, FAR 9.406-2(a)(1) provides absolutely no basis for Treasury to debar Canales. FAR 9.406-2(a)(1) provides that a debarring official may debar a "*contractor* for a conviction

of… (1) Commission of fraud or a criminal offense in connection with – (i) Obtaining; (ii) Attempting to obtain; or (iii) Performing a public contract or subcontract." (emphasis added).  In the Canales Debarment Notice, Sharpe claims that Canales' violation of 18 U.S.C. § 1018 was "in connection with an ongoing procurement." (*See* the Canales Debarment Notice at p. 1).  This is simply untrue.  First, Canales, as an individual, has never been a government contractor.  Second, Canales' false written statement was not connected to any Government procurement. (*See* the Arraignment Transcript at p. 13).  Third, not only did the Government did not charge Canales with any violation of any bribery or gratuity laws or corruption offenses, it expressly disclaimed any allegation of any such procurement violation. (*See* the Sentencing Transcript at p. 5).

As with the debarment of M Squared, debarring Canales appears to be a purely penal action by Treasury with no sound basis in the law.  The fact that Treasury's Office of Inspector General is dissatisfied with the conclusions of the U.S. Attorney's Office's investigation – that the OIG's allegations of procurement fraud by Ms. Canales were groundless, is clearly not a proper basis for taking punitive action against Ms. Canales.  There is no other credible explanation for initiating a debarment proceeding nearly two years after Schindel first published his obviously false (then and now) statements about Ms. Canales.

The only other plausible (but equally invalid) explanation for the debarment of Ms. Canales would be Treasury's apparent desire, retroactively, to cover-up or justify the false statements that the Treasury's OIG made about Ms. Canales in its two annual reports to Congress, the October-March Report and the April-September Report.  Of course, this is not a proper justification for debarment, as the public interest is not served by having the Government seek to cover-up its previous mistakes and intentional false written statements to Congress.  *See*

FAR 9.402(b) ("The serious nature of debarment and suspension requires that these sanctions be imposed only in the public interest for the Government's protection and not for the purposes of punishment."). Nor are Plaintiffs aware of any exception or license for an agency head to lie intentionally to Congress about an individual and then retroactively seek to (partially) justify the false statements years later by commencement of debarment proceedings. Therefore, because the Canales Debarment Notice is improper and contrary to law, there is a substantial likelihood of success that Canales will succeed on the merits of her claims.

    2.    <u>Ms. Canales Will Suffer Irreparable Harm if the Government is Permitted to Enforce the M Squared Debarment Notice.</u>

To demonstrate irreparable harm if an injunction does not issue, a plaintiff must show that the harm it faces is imminent and certain, rather than remote and speculative. *Trudeau v. Fed. Trade Comm'n*, 384 F. Supp. 2d 281, 297 (D.D.C. 2005); *see also Wisconsin Gas Co. v. FERC*, 244 U.S. App. D.C. 349, 758 F.2d 669, 674 (D.C. Cir. 1985) ("the injury must be both certain and great; it must be actual and not theoretical").

In the instant case, if the Government is permitted to enforce the debarment against Ms. Canales, then Ms. Canales must be considered a contractor, pursuant to FAR 9.403. If Canales is considered a contractor, then Canales' reputation will undeniably suffer certain irreparable damage. (Canales Decl. at ¶ 26). Ms. Canales is now unable to apply for government contracts, or to be employed as a principal or agent by any entity that is a government contractor, for a period of three years. Given the indisputable severity of the sanction, it is incontestable that enforcement of the wrongful debarment would result in irreparable harm as it would ruin Canales' reputation and render her unemployed and unemployable by any entity that does contract with the Government for at least the next three years. *See* FAR 9.406-4(a)(1).

3. **An Injunction Enjoining the Government from Enforcing Ms. Canales Debarment Notice is in the Public Interest.**

The Government has an interest in ensuring that when debarments issue, they issue to debar unscrupulous contractors for criminal or dishonest conduct relating to government contracts or procurement and not to punish an agency's former employee. *See Robinson v. Cheney*, 876 F.2d 152, 160 (D.C. Cir. 1989). The public interest is certainly not served by using the debarment process as a retroactive device to cover-up or justify false statements made about Ms. Canales by the Treasury's OIG in its two annual reports to Congress. Therefore, it is in the public interest to enjoin the Government from enforcing Ms. Canales' Debarment Notice, because to allow otherwise would be to punish Ms. Canales, which is contrary to FAR 9.402(b), and to permit an agency cover-up of its misdeeds.

4. **There is no Harm to the Government if it is Enjoined from Enforcing the M Squared Debarment Notice.**

It cannot be reasonably disputed that, to allow the Government the opportunity to contract with presently responsible contractors, such as Ms. Canales, the Government would be harmed in any way. Indeed, it is the Government's duty to ensure that it does not disqualify such responsible contractors. *Robinson*, 876 F.2d at 160.

Based on the forgoing, this Court should enjoin the Government from enforcing the debarment of Ms. Canales. Treasury issued its debarment of Ms. Canales without any basis in law or fact, thereby making the debarment void, such that there is a substantial likelihood of success that Ms. Canales will succeed on the merits of the litigation. Moreover, Ms. Canales will suffer irreparable injury if no injunction is issued, as her business reputation will be ruined, she will become unemployed and she will be barred from contracting with the Government, or being employed as a principal or agent of another government contractor, for at least three years. The

public interest is served by enjoining the Government from enforcing Ms. Canales' unlawful debarment, because to allow otherwise would be to allow the Government to punish Ms. Canales and (partially) cover-up its prior misdeeds. Finally, the Government will not suffer any harm if the injunctive relief is granted.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray that this Court:

1. Grant Plaintiff's Application for a Preliminary Injunction enjoining the Government from enforcing Treasury's June 27, 2006 debarment notices to M Squared and Ms. Canales;

2. Enjoin the Government from enforcing the debarments of M Squared and Ms. Canales ;

3. Award M Squared and Ms.Canales their reasonable attorney's fees and costs expended herein;

4. Grant such other and further relief as this Honorable Court deems just and proper.

DATED: August 9, 2006.                           Respectfully submitted,


/s/ Steven D. Cundra
By: One of their attorneys
Steven D. Cundra, D.C. Bar No. 374074
Amy Epstein Gluck, D.C. Bar No. 453525
Nicholas M. Beizer, D.C. Bar No. 485894
**HALL, ESTILL, HARDWICK, GABLE, GOLDEN & NELSON, P.C.**
1120 20th Street, N.W.
Suite 700, North Building
Washington, D.C. 20036
(202) 973-1200
(202) 973-1212 (fax)
*Attorneys for Plaintiffs*

- 20 -

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 9th day of August, 2006, a copy of the foregoing documents were served, via the Court's CM/ECF system, upon:

> JOHN C. TRUONG
> Assistant United States Attorney
> 555 4th Street, N.W.
> Room E-4206
> Washington, D.C. 20530
> Attorney for Defendants

/s/ Steven D. Cundra
Steven D. Cundra

65559.3:230133:00420