## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

MARIA CANALES and M SQUARED
STRATEGIES, INC.,

     Plaintiffs,

v.                                                                    Civil Action No: 1:06CV01330 (GK)

HENRY M. PAULSON,
SECRETARY OF THE UNITED STATES
DEPARTMENT OF TREASURY, *et al.*,

     Defendants.
_____

### PLAINTIFFS' REPLY TO DEFENDANTS' OPPOSITION TO PLAINTIFFS' APPLICATION FOR PRELIMINARY INJUNCTION AND MOTION [SIC] FOR A TEMPORARY RESTRAINING ORDER [Dkt. No. 21][1]

Plaintiffs Maria Canales ("Canales") and M Squared Strategies, Inc. ("M Squared") hereby file Plaintiffs' Reply to Defendants' Opposition to Plaintiffs' Application for Preliminary Injunction and Motion for a Temporary Restraining Order ("Plaintiffs' Reply").

### INTRODUCTION

Plaintiffs have demonstrated that their debarments are based upon unlawful considerations by the Debarring Official ("DO") contrary to the FAR regulations and that those debarments are causing and continuing to cause irreparable harm. Defendants ignore the U.S. Attorney's Office's conclusions and resolution of the Treasury Office of Inspector General's ("OIG") investigation of Canales while she was a Treasury employee, produce documents absent from the Administrative Record proving that the Treasury was aware since at least August 2005 that the OIG publications to Congress were materially false but failed to correct those false and

---

[1]     In a separate submission to the Court, Plaintiffs will oppose Defendants' Motion for Summary Judgment and Statement of Material Facts, which were filed simultaneously with Defendants' Opposition to Plaintiffs' Application for Preliminary Injunction and Motion [sic] for Temporary Restraining Order.

defamatory public statements.  Instead, they engaged in "fast action" to cover up their misconduct and attempted to shield and conceal their wrongful actions by acting outside the official channels in improper "attorney-to-attorney" communications between the OIG's counsel and the DO's counsel.  Now, Defendants attempt to introduce new theories for the debarment in their papers time that are absent from the Administrative Record, the debarment notices themselves, and contrary to the evidence contained in the official records of the United States District Court.  Nowhere, however, do they attempt to justify their jurisdiction to debar, as Treasury has never contracted with either Plaintiff.

Indeed, in Defendants Opposition to Plaintiff's Application for Preliminary Injunction and Motion for Temporary Restraining Order ("Defendant's Opp."), Defendants have abandoned the position stated in the DO's Notice of Debarment of M Squared and, belatedly, now attempt to defend the debarment of M Squared by arguing that the debarment was based on an "alter ego" determination pursuant to FAR § 9.406-5(a).  This post hoc rationalization by Defendants' counsel should be rejected as neither that theory nor that regulation are found anywhere in the DO's Notices of Debarment to both Plaintiffs or in the Administrative Record.  Moreover, neither the affidavit or the declaration submitted with Defendants' Opposition address this new theory or FAR citation.  In fact, the cited regulation does not support the DO's claim for imputed debarment of M Squared; rather, the plain language of the regulation confirms legal invalidity of the attempted imputed debarment of M Squared fails as a matter of law.

The debarment of Canales is also void as a matter of law because she was not a contractor subject to a debarment proceeding at the time of the false writing misdemeanor to which she pleaded guilty, and her conviction was not related in any way to any procurement violations.  Both the OIG and DO's continual efforts to characterize that conviction as one for

corruption, bribery, or the acceptance of a gratuity in connection with an ongoing procurement fraud are absolutely false and defamatory statements.  Indeed, the statements of the United States Attorney and the transcripts of the plea and sentencing proceedings upon which  Defendants allege expressly contradict these claims.

Defendants' arguments in Defendants' Opp. demonstrate that Defendants have deliberately lied to Congress about what they describe as Canales's "bribery, corruption and criminal acceptance of gratuities in a government procurement" conviction and her "life-time debarment".  Worse, with full knowledge of the truth, Defendants have deliberately perpetuated those lies without correction in subsequent reports.

**A**t the telephonic hearing on August 9, 2006,  this Court inquired of the Defendants' counsel regarding these false and defamatory statements about Canales, which were published in official reports to Congress.  Counsel promised to make inquires and provide explanations to the parties and the Court as how and why these statements were made but Defendants' responses in their Opposition papers fall woefully short of any reasonable explanation.  The explanations actually raise more questions than they answer and can only be characterized as perpetuating a "cover-up" of wrongful government conduct by officials who apparently believe they enjoy absolute immunity from the Plaintiffs and this Court.  Plaintiffs demand be Defendants properly address the Courts inquires.

## **BACKGROUND FACTS**

On February 25, 2002, OIG initiated an investigation based on a complaint from a confidential source that Canales, that the U.S. Department of Treasury's ("Treasury") Chief Information Officer, was involved in unlawful procurement practices, to wit:  the receipt of gifts and personal vacations from a personal friend (Neal) in exchange for "greatly influencing" the

sole source award of a $5.7 Million IT contract to Booze Allen Hamilton ("BAH"), which

included a $1.5 Million subcontract to a company ("Enterasys, Inc.") "represented by Neal."[2]  In

the course of the OIG investigation, OIG agents interviewed Canales on June 6, 2002, and she

acknowledged that she had received a vase from Neal, but she denied that she had accepted a

personal gift of two blue emerald chips, valued at $800.[3]  She also denied any connection

between any gifts and the award of the $5.7 Million BAH contract or BAH's subcontract with

Enterasys, Inc.  This interview was reduced to a written statement on that same day.[4]

The results of the OIG's investigation were turned over to the Department of Justice for

criminal prosecution.  On April 13, 2004, the United States filed a one count Information against

Ms. Canales, charging her with a violation of 18 U.S.C. § 1018, making a false writing in

connection with her acceptance of the two emerald chips (which she initially denied in her

interview with the Treasury OIG).  At the Arraignment Hearing on April 19, 2004, AUSA

Howard Sklamberg gave a proffer of what the evidence would have shown had the case gone to

trial.[5]  After his proffer, Canales's counsel noted, "there is no connection proffered by the United

States Attorney's Office that connects any procurement to those gifts."[6]  When asked to respond

by the judge, the AUSA stated: "This is a plea to Section 1018 *and we're not alleging a violation*

*of the bribery or gratuity statute*, so that statement I think does not detract from the factual

proffer."[7]  Canales then entered her plea of guilty to the misdemeanor violation.

On April 30, 2004, following the plea proceedings, Treasury's Inspector General (the

"IG") published his Semi-Annual Report ("SAR") to Congress for the period October 1, 2003 –

---

[2]     Administrative Record, hereinafter "AR," CAN 0018 - 0019.
[3]     AR CAN 0019.
[4]     AR CAN 0042 - 0044.
[5]     AR CAN 0129 - 0133.
[6]     AR CAN 0133.
[7]     AR CAN 0133.

March 31, 2004.  Inexplicably, the IG *falsely reported that Ms. Canales had pleaded guilty to procurement fraud* – the acceptance of bribes and gratuities in exchange for the award of a $1.5 Million subcontract:

### Former Acting Treasury CIO Debarred for Life for Making False Statements

A complaint filed with Treasury OIG alleged, as part of or in exchange for a $5.8 million [sic] contract for cyber-security related software and consulting services, Treasury's former Acting CIO directed the contractor to place a $1.5 million subcontract with a company owned by a friend of the CIO.  Our investigation revealed that, in return, the CIO received various gratuities including jewelry and use of a time-share rental property located in the Bahamas.  The former CIO agreed to plead guilty to making False Statements in Official Certificates or Writings (18 U.S.C. §1018) and to be debarred from doing business with the federal government for life.

To make these false statements more noticeable and as damaging as possible, the Treasury OIG inserted a color photograph showing a sailboat anchored on a Caribbean island with a palm tree in the foreground![8]

On July 13, 2004, at Canales's sentencing hearing, AUSA Sklamberg directly refuted the OIG's statements in the OIG's April 30, 2004 SAR, by informing the Court:

> As the Court knows from reviewing the actual proffer upon which the parties agreed, this case stems from an investigation by the Inspector General's Office into activities by Ms. Canales.  ***There ended up being no allegation that Ms. Canales broke any of the bribery or gratuity laws or corruption offenses.***
>
> In the course of the investigation, however, Ms. Canales made a false written statement to the Inspector General…That false statement forms the basis, the false written statement, forms the basis to the misdemeanor to which Ms. Canales pled.[9]

Apparently displeased with the handling of its allegations by the Department of Justice and the Court, on October 29, 2004, the Treasury OIG *again* decided to re-publish the false and

---

[8]    Exhibit 5[Dkt. No. 9] to Plaintiffs' Application for Preliminary Injunction,  ("Plaintiffs' App. PI") [Dkt. No. 7] filed on August 9, 2006.

[9]    AR CAN 0144-0145.

defamatory statements about Canales's misdemeanor conviction, this time publishing her full name in addition to her former position at Treasury:

### Former Acting Treasury CIO Sentenced to Making False Statement and Debarred for Life

In our March 2004 report (p.15), we reported Treasury's acting Chief Information Officer (CIO), Maya Canales, directed a consulting firm under contract with the Department to secure a $1.5 million subcontract with a company owned by the CIO's friend, as part of (or in exchange for), a $5.8 million contract that Treasury awarded to the consulting firm. That investigation revealed the acting CIO accepted various gratuities including jewelry and the use of a time-share rental property.

The former acting CIO pled guilty to making false statements in official Certificates or Writings (18 U.S.C. § 1018) and has been debarred for life from doing business with the federal government.  In July 2004, the former action CIO was sentenced in United States District Court to 1 year probation, fined $2,500, and ordered to perform 25 hours of community service.[10]

This re-publication again falsely stated, contrary to the clear evidence of record in her criminal case, that Canales had pled guilty to criminal procurement fraud violations in connection with a $1.5 million sub-contract and had been debarred for life from doing business with the federal government.

In Defendants' Opposition, they reveal for the first time that the Inspector General's counsel, Mr. Richard K. Delmar, received an inquiry on August 9, 2005 regarding the accuracy of the statements in the OIG's October 2004 SAR in connection with a pending FOIA request. He received this email inquiry on August 9, 2005 at 11:28 a.m. from David Perera, Senior Reporter, Federal Computer Week.[11]  By 11:48 a.m., only 20 minutes later, Mr. Delmar informed Mr. Perera that the statement in the SAR concerning the lifetime debarment of Canales was inaccurate.[12]

---

[10]     Exhibit 6 to Plaintiffs' App. PI [Dkt. No. 9].
[11]     Affidavit of counsel Richard K. Delmar ("Delmar Aff.") Attachment A.
[12]     *Id.*

Next, Mr. Delmar states that he received a second inquiry, an email from John Breslin to the OIG Hotline on August 25, 2005, reporting that, if the statement regarding Canales's lifetime debarment in the OIG's March 2004 SAR is true, Canales is violating her plea agreement as she has a lucrative contract with a federal agency.[13]  A Clifton Brown, Jr. (a Treasury OIG official whose position is unidentified by Defendants) responded to Mr. Breslin, stating that,

> "the Treasury OIG did report that the subject had been debarred for life; however, this statement was made in error.  The subject's conviction was reported to the Department of Treasury for appropriate action, which can include suspension or debarment.  We will bring the information provided to the attention of the appropriate department officials."[14]

On that same day, September 7, 2005, approximately 2½ hours after Mr. Brown's e-mail to Mr. Breslin, the OIG's counsel, Mr. Delmar, reported to his OIG colleagues that he talked directly to Bill Murphy, the Debarring Official's counsel, and "forwarded this email package to him, *stressing the need for fast action. We'll see...*"[15]  This communication or meeting was clearly outside the established channels of communication between the IG and the DO.[16, 17]

On November 29, 2005, more than 19 months after first publicly announced her "Life-Time Debarment," but only a little more than two months after OIG's counsel, Mr. Delmar ' "[stressed] the need for fast action" to Bill Murphy, the DO's counsel, Treasury informed Canales, for the first time, that it was initiating debarment proceedings against her.[18]  Then, on

---

[13]    Delmar Aff., Attachment B.
[14]    *Id.*
[15]    Delmar Aff., Attachment C.  (emphasis added).
[16]    *See* Declaration of Mr. Thomas A. Sharpe Jr. ("Sharpe Decl.") at ¶ 1 and Delmar Aff. at ¶ 2-3.
[17]    These newly released communications, which are not in the Administrative Record, raise a number of very serious and troubling questions.  First, why is OIG's counsel, Mr. Delmar, having a "lawyer-to-lawyer" communication with the DO's attorney, Bill Murphy, outside the established channels of communication.  Second, why is Mr. Delmar discussing the SARs with the DO's attorney. Third, why is Mr. Delmar telling the DO's attorney that he "need[s] fast action" from the DO.  Fourth, if there is any legitimate basis for this communication between independent units of Treasury, why are these communications not made through official channels such as the communication of the OIG's September 30, 2004 Report of Investigation ("ROI").  (*See* AR CAN 0018).  Fifth, why is the referenced follow-up email between attorneys Delmar and Murphy not produced.
[18]    AR CAN 0014-0015.

June 27, 2006, the DO sent Notices of Debarment, effective for three years, to both Canales and M Squared.[19]  This injunctive action followed.

## ARGUMENT

I.    **PLAINTIFFS SATISFY THE STANDARDS FOR INJUNCTIVE RELIEF; PLAINTIFFS SHOW A STRONG LIKELIHOOD OF SUCCESS ON THE MERITS AS THE DEBARMENT OF PLAINTIFFS IS CONTRARY TO THE FAR REGULATIONS AND BASED ON BLATANT MISREPRESENTATION OF THE OFFICIAL RECORDS OF CANALES'S CASE IN THE UNITED STATES DISTRICT COURT.**

    A.    **Debarment Is Based Upon Unlawful Considerations As Evidenced By the Complete Ignorance of, or Intentional Disregard for, the Official Records of Proceedings in Ms. Canales's Plea and Misdemeanor Conviction Case in the United States District Court.**

Defendants, from 2004 through the present date, have consistently ignored the undisputed evidence contained in the Administrative Record that the U.S. Attorney's Office did *not* find Canales guilty of violating *any* bribery or gratuity statutes or committing any corruption offense in connection with an ongoing procurement.[20]  While Defendants correctly assert that Canales pled guilty for a "false writing" during her employment at Treasury, their brief[21] notably omits the salient fact that her conviction was *not* for a false writing in violation of procurement regulations or bribery or gratuities or corruption statutes or any other felony.  This critical distinction was specifically explained by the AUSA Sklamberg during both Canales's arraignment and sentencing hearings.[22]

A Memorandum of Activity in the OIG report (which is part of the Administrative Record) lists all of the allegations for which the Treasury OIG investigated Canales;[23] however,

---

[19]    AR CAN 0011-0013.
[20]    AR CAN 0133 and 0144-0145.
[21]    *See* Defendants' Opp. at pp. 3 and 13.
[22]    *Id.*
[23]    AR CAN 0085.

Defendants never admit, certainly not in the Debarment Notices or in their papers filed in this Court, what they all know to be undisputedly true: the U.S. Attorney's Office found no basis on which to prosecute Canales for any of these allegations. The AUSA Sklamberg also made it very clear that the only false writing made to OIG personnel, regarding a gift of emerald chips from a long-time friend valued at $800, did not relate in any way to any procurement, bribery, gratuity, or corruption statutes or activity.[24]

Defendants now unequivocally admit that the statement in the April 2004 and October 2004 SARs that Canales was "barred for life" from doing business with the Federal Government following her misdemeanor guilty plea is false and erroneous.[25] However, Defendants are unable to explain how these grossly "erroneous" statements found their way into the two SARs.[26] It is difficult to imagine that the OIG, which is charged by law with preparing only two SARs per year to Congress, can not determine who drafted the offending and erroneous statements that were given so much attention that the first one included a color photograph of a tranquil Caribbean island beach scene, complete with sailboat and palm tree!

It is offensive enough for Defendants to continue to argue that the blatantly false reports *only* had to do with the "relatively minor" issue of stating that Canales was debarred for life, when *she had not been debarred at all*. In fact, no debarment proceedings had even been initiated by 2004.[27] Nevertheless, Defendants allegedly have no idea how two SARs, six months apart, unequivocally stated that Canales had been "debarred from doing business with the federal government for life" as part of her 18 U.S.C. § 1018 guilty plea. They then seek to further downplay their conduct by stating that, subsequently, she was debarred for three years and that

---

[24]     AR CAN 0133 and 0144-0145.
[25]     Defendants' Opp. at pp. 3 and 6.  *See also* Exhibits C and D to Plaintiffs' Complaint.
[26]     Delmar Aff. at ¶ 12.
[27]     Sharpe Decl. at ¶ 3.

they will correct the "erroneous" information in the 2004 SARs by a correction in their next SAR to reflect this year's three-year debarment.

More offensive, however, is the complete disregard for (and failure to respond to) the most damaging representation in the false SARs. Both SARs averred that Canales engaged in procurement fraud, to wit, a *quid pro quo* between Canales and a Treasury consultant. Both SARs state unequivocally that Canales received jewelry and the use of a time share in the Bahamas in exchange for the award of a $1.5 Million sole-source subcontract and that Canales pleaded guilty to making false statements based on this bribery, gratuity or procurement fraud. As noted above, one of the false SARs even showed a picture of a sailboat in clear blue Caribbean water and a palm tree on a beach to underscore Canales's alleged, *yet previously found to be false*, allegation of procurement fraud. In Defendants' Opp., Defendants *completely ignore* these false and defamatory statements in the SARs and provide no explanation or rationalization for their inclusion and false content.

The determination by the DO and the statements by the IG that Canales was "convicted of violating 18 U.S.C. § 1018 [for] making a false statement in connection with an ongoing procurement" and that she "directed a consulting firm under contract with [Treasury] to secure a $1.5 million subcontract with a company owned by the CIO's friend, as part of (or in exchange for), a $5.8 million contract that Treasury awarded to the consulting firm [and] accepted various gratuities including jewelry and the use of a time-share rental property," respectively, are demonstratively false. The U.S. Attorney's Office flatly stated that the § 1018 misdemeanor conviction was not related to any procurement actions and that there is "no allegation Ms. Canales broke any of the bribery or gratuity laws or corruption offenses."[28] Accordingly, the

---

[28]    AR CAN 0133 and 1044-1045.

debarments based on these erroneous statements cannot stand and should be enjoined immediately.

       1.     <u>Defendants Ignore the Public Record of the U.S. Attorney's Office's Conclusion of the OIG Investigation in the District Court.</u>

Clearly, the DO ignored the findings and statements of the Assistant U.S. Attorney at Canales's arraignment and sentencing hearings even though the transcripts of those hearings *are part of the administrative record*.[29]  At the Arraignment Hearing on April 19, 2004, AUSA Sklamberg gave a proffer of what the evidence would have shown had the case gone to trial.[30] After his proffer, Canales's counsel noted, "there is no connection proffered by the United States Attorney's Office that connects any procurement to those gifts."[31]  When asked to respond by the judge, AUSA Sklamberg stated: "[T]his is a plea to Section 1018 *and we're not alleging a violation of the bribery or gratuity statute*, so that statement I think does not detract from the factual proffer."[32]  Then, on July 13, 2004, at Canales's Sentencing Hearing, AUSA Sklamberg stated:

> As the Court knows from reviewing the actual proffer upon which the parties agreed, this case stems from an investigation by the Inspector General's Office into activities by Ms. Canales.  ***There ended up being no allegation that Ms. Canales broke any of the bribery or gratuity laws or corruption offenses.***
>
> In the course of the investigation, however, Ms. Canales made a false written statement to the Inspector General…That false statement forms the basis, the false written statement, forms the basis to the misdemeanor to which Ms. Canales pled.[33]

The first false SAR to Congress was published on April 30, 2004, *subsequent* to the arraignment hearing (April 19, 2004), and the OIG published the second false SAR on October

---

[29]      AR CAN 0121-0153.
[30]      AR CAN 0129-0133.
[31]      AR CAN 0133.
[32]      *Id.* (emphasis added).
[33]      AR CAN 0144-0145.

29, 2004, well after both the arraignment hearing *and* the sentencing hearing (July 13, 2004). The OIG simply ignored the AUSA's official and public record of the conclusion of the criminal investigation of the OIG allegations; instead, they published the false SARs as if to change the result of the AUSA's investigation and resolution of the matter. This implication, that Canales's conviction was based on procurement fraud rather than for a single misdemeanor offense *unrelated* to procurement fraud, bribery, or gratuities, when the AUSA affirmatively stated the opposite, wended its way into the debarment notice as the basis for debarment, as the debarment notice states: "You were convicted of violating 18 U.S.C. § 1018, making a false writing in connection with an ongoing procurement."[34] On its face, the Debarment Notice <u>ties</u> the false writing to procurement. The Department of Justice investigated the matter and found no nexis whatsoever between the false writing and procurement. Accordingly, the conviction serves as an improper basis upon which to base the debarment of the Plaintiffs.

Further, Defendants cavalierly assert that IG's two false reports to Congress regarding the basis for Canales's plea and conviction did not affect Canales or M Squared because M Squared still obtained government contracts.[35] This argument is unavailing because while M Squared obtained government contracts in the latter half of 2004, the SARs only mention Canales, not M Squared; and Canales is not the government contractor, only M Squared is a government contractor. More significantly, both Canales and M Squared have been debarred on the same false assumptions found in the SARs and the DO's debarment decision. And the ability of M Squared to obtain government contracts and for any company that employs Canales to obtain government contracts in the future has been impaired by the stigma of the false accusations and debarments based on those false criminal accusations.

---

[34]    AR CAN 0011.
[35]    Defendants' Opp. at p. 7.

Defendants' rejoinder is to figuratively stick their tongues out at Plaintiffs by claiming that despite these false representations, Plaintiffs are prohibited from suing them for defamation under the Federal Torts Claims Act.[36]  As a result, Defendants claim that they are not obligated to correct the false SARs claiming that Canales's conviction was for procurement fraud and illegal acceptance of gratuities in connection with a government procurement.  They blithely state that since they are immune from suit, the falsies alleging that Canales committed procurement fraud published in the SARs are irrelevant.[37]  Defendants' outrageous conduct in this case does not stop there.

2.    The DO's Claim That He "Didn't Know" That The IG Had Published False Reports About Canales Simply Does Not Ring True, As The Evidence Shows That Treasury Was Aware That The SARs Were False Since August 2005 And Are Now Trying To Cover Up Their Knowledge.

Defendants claim, by affidavit, that Treasury received two emails in August 2005, questioning the veracity of the SARs about Canales and her alleged lifetime debarment.[38]  Incredibly, these emails, and the responses to them, *are not in the Administrative Record*. Rather, they are attached to Mr. Delmar's Affidavit as Attachments A through C.  Inexplicably, the OIG never corrected the SARs in 2005 even though the OIG represented to the inquirers that it would correct the record and despite having actual (and now admitted) notice that they had published false reports to Congress.  Defendants could have retracted the false statements in the October 2005 and/or in the April 2006, semi-annual reports to Congress.  However, they failed to do so.  The only plausible reason for this can be that which Plaintiffs have been propounding since the inception of this lawsuit:  the debarment of Canales and M Squared rests on an impermissible basis - - to punish Canales for acts she allegedly committed as a Treasury

---

[36]    Defendants' Opp. at pp. 7-8.
[37]    *Id.*
[38]    Defendants' Opp. at pp. 6-7.

employee. Accordingly, the OIG would not correct the erroneous SARs regarding "lifetime debarment" until he could persuade the DO's attorney to get the DO to at least issue a three-year debarment.

Since the U.S. Attorney's Office refused to find that Canales committed procurement fraud, Defendants are punishing her the only way they can – by ruining her business. It is unbelievable that now, more than one full year after they admit they were aware of the false reports to Congress in April and October 2004, and after two prior missed opportunities to correct their false statements in the October 2005 and April 2006 SAR, respectively, Defendants state that they will only *now* correct their "error."[39] Since the truth of these two SARs were called into question, rather than correcting those blatantly false statements in the October 2005 and April 2006 SAR, Defendants instead initiated the proceeding to debar Canales to "backfill" their misconduct. This constitutes shameful and flagrant government misconduct.

Further, while Defendants claim that Mr. Sharpe was unaware that the SARs to Congress were false and that he did not, in any event, the SARs consider when he determined to debar Plaintiffs,[40] *his lawyer certainly did have knowledge of the false SARs*, and, therefore, the DO's claim that he did not determine to debar Plaintiffs because of the false statements is unavailing and further exhibits Defendants' attempts to mask this horrendous and unlawful treatment of Canales and M Squared.

Mr. Delmar is counsel for the Treasury OIG.[41] In an email on August 9, 2005 at 11:28 a.m., David Perera, a senior reporter for Federal Computer Week, questions the veracity of the second SAR, and, directs his inquiry directly to Mr. Delmar.[42] Three minutes later, on the same

---

[39]     Defendants' Opp. at p. 6.
[40]     Defendants' Opp. at pp. 7 and 17; Sharpe Decl. at ¶ 6.
[41]     Delmar Aff. at ¶ 1.
[42]     *Id.* at Attachment A.

date, Mr. Delmar emails Mr. Brown questioning why the SAR states that Canales was debarred and inquiring whether "we," meaning the OIG, were "premature" to relate in the SAR that Canales was debarred.[43]  Seventeen minutes after Mr. Delmar questioned the publication in the SAR about Canales's false debarment, he responded to Mr. Perera (1) claiming that the publication in the SAR that Canales had been debarred was "inaccurate," (2) debarment "is being reviewed" by Treasury based on the ROI report, and (3) no final determination has been made so the case is still open.[44]  The Court should bear in mind that OIG's counsel made these representations when *debarment proceedings against Canales had not even been initiated*.[45]

Then, on August 25, 2005, Mr. John Breslin sent an email to the Treasury OIG's hotline questioning the accuracy of the April 2004 SAR, which stated that Canales had been debarred for life from doing business with the Government, because he noted that Canales had a lucrative contract with the Department of Veteran Affairs and was not on the list of debarred contractors.[46]  Almost two weeks later, the same Mr. Brown with whom Mr. Delmar communicated on August 9, 2005, claimed that the SAR reporting that Canales had been debarred for life had been made in error.[47]  Mr. Brown sent an "FYI" of the communication to counsel for OIG, Mr. Delmar, and two other individuals, a Mr. Everetts, Jr. and Mr. Hoecker.[48]  Then, on the same day, August 25, 2005, Mr. Delmar responds that he spoke with "Bill Murphy," who is "Senior Counsel" for the Department of Treasury and the DO's counsel, "stressing the need for fast action."[49]  Of course, none of these email communications are in the Administrative Record.  This "attorney-to-attorney" communication is interesting for three reasons:

---

[43]        *Id.*
[44]        *Id.*
[45]        *See* AR CAN 0014-0015, November 29, 2005 notice to Canales from Sharpe advising her "that we are initiating proceedings to debar you …."
[46]        *Id.* at Attachment B.
[47]        *Id.*
[48]        *Id.*
[49]        *Id.* at Attachment C; AR CAN 0003.

1.      Defendants take great pains in Mr. Sharpe's Declaration and Mr. Delmar's Affidavit to assert the Treasury OIG's complete independence from the Treasury Department, and the Debarring Official.[50]  The OIG is charged with conducting and supervising audits and investigations relating to the programs and operations of the Department.  The lines of authority are entirely separate, the OIG reports only to the Deputy Secretary and, in addition is required to report its work directly to Congress, which it does in its SARs issued April and October of each year.[51]  Mr. Delmar asserts that the OIG's activities cannot be controlled by any other official of the Treasury Department.[52]

2.      Mr. Sharpe's declaration goes one step further than Mr. Delmar's Affidavit by stating that he does not report to the IG, but only to the Assistant Secretary for Management and CFO of Treasury, and that once he received the ROI from OIG, he did not then report to the OIG or communicate with them.[53]

3.      The synopsis in the ROI sets forth the channels of distribution of the OIG report to the Treasury Department.[54]  The Treasury OIG  submitted the ROI to the Assistant Secretary for Management Department of Treasury.  This office, which includes the Office of Procurement Executive, is the division in which the Debarring Official is located.[55]

Despite the above clear and established lines of communications, within two and a half hours of a hotline inquiry, *counsel* for the Treasury OIG is immediately communicating with senior *counsel* for the DO outside the proper channels of communication calling for "fast action" to fix their very public misrepresentations concerning Canales.  Presumably, these are "counsel-to-counsel" conversations so that the officials involved, like Defendant Sharpe, the DO, can be shielded by the attorney-client privilege and can later claim that they knew nothing about the false SARs.[56]  The Sharpe declaration, Delmar Affidavit, and these emails between OIG and Treasury speak for themselves and demonstrate, on their face, that the debarment of Canales and M Squared was arbitrary, capricious, and instituted for improper purposes such as to punish Canales and then clean up the OIG's false and defamatory statements to Congress.  Such actions

---

[50]     Sharpe Decl. at ¶ 1; Delmar Aff. at ¶¶ 2 and 3.
[51]     Delmar Aff. at ¶¶ 2 and 3.
[52]     *Id.* at ¶ 3.
[53]     Sharpe Decl. at ¶¶ 1, 2, and 4.
[54]     AR CAN 0018.
[55]     *Id.*
[56]     *See* Defendants' Opp. at p. 17.

should not be allowed to stand, and this Court should recognize Plaintiffs' likelihood of success on the merits on this basis.

**B.**    **Defendants Lack A Lawful Independent Basis To Debar M Squared, And Their Cited Bases For Its Debarment Are Contrary To Law And The Regulations They Cite In Support Of The Debarment.**

The Government essentially alleges two theories for debarring M Squared.[57]  Both theories exhibit the arbitrary and capricious nature of Defendants' actions in this case, are contrary to law, and are unsupported by the record.  The first theory espoused by Defendants for debarring M Squared is found in the debarment notice sent to M Squared (which refers M Squared to the debarment notice sent to Canales), *i.e.*, Defendants claims that M Squared is debarred simply by the fact that Canales's debarment is imputed to it by FAR § 52.209-5(a)(2). The second theory, which is raised for the very first time in Defendants' Opposition, is that M Squared is the "alter ego" of Canales pursuant to FAR § 9.406-5(a).[58]

1.    The DO's Debarment of M Squared on an Imputation Theory under FAR § 52.209-5(a)(2) is Unlawful and Void.

Defendant Sharpe states that the debarment of Canales also applies to Canales's "place of employment in the event [Canales is] employed as a 'principal' as defined by the certification requirements under FAR § 52.209-5(a)(2)."[59]  Thus, Defendant Sharpe attempts to debar M Squared solely by imputing Canales's debarment to M Squared; in so doing, Defendant Sharpe tacitly admits that there is no independent basis to debar M Squared.  Certainly, the Debarment Notices and the Administrative Record set forth no other basis for M Squared's debarment.

As explained in M Squared's Application for TRO, FAR § 52.209-5(a)(2) merely provides the definition of what a principal is for the purposes of certifications required to be

---

[57]    AF CAN 0011-12; Defendants' Opp. at p. 15.
[58]    Defendants' Opp. at p. 15.
[59]    AR CAN 0011-0012.

completed when bidding on a solicitation and does not contain any language that would provide a basis to impute the debarment of Canales to M Squared.[60]  In fact, to read FAR § 52.209-5(a)(2) as providing a basis for debarment, as Defendants suggest, would, in reality, render that section nugatory, for there would be no need for a certification to be submitted by a contractor with a "principal" (as broadly defined in that regulation) having a prior criminal conviction or debarment.  Under the DO's theory all such contractors are automatically debarred.  The DO's assertion is absurd and this explains why it is no longer asserted by Defendants as grounds for M Squared's debarment.

When M Squared applied for government contracts, Canales truthfully completed such certifications on behalf of M Squared and disclosed her misdemeanor conviction. Notwithstanding Canales's conviction and disclosure of the same, M Squared has received multiple contracts from various federal agencies.[61]  For these reasons, Defendants' imputation theory fails, the debarment of M Squared is improper on the basis cited by the DO, and the debarment against M Squared should be enjoined.

      2.    <u>The Government's New "Alter Ego" Imputation Theory Under FAR § 9.406-5(a) Does Not Provide a Basis for the Debarment of M Squared.</u>

Defendants, through their counsel in Defendants' Opp., now assert for the first time that M Squared should be debarred because it is the "alter ego" of Canales and, therefore, Canales's debarment may be imputed to M Squared under FAR § 9.406-5(a).  Counsel's "alter ego" theory, however, is not cited anywhere in the Administrative Record, the debarment notices, or, amazingly, even in the affidavit and declaration attached to Defendants' Opposition, which

---

[60]      M Squared's App. for TRO at pp. 6-9.
[61]      Plaintiffs' App. for TRO at pp. 4-5.

counsel cite to as the basis for asserting their "alter ego" theory.[62]  This theory was created from whole cloth by Defendants' counsel, and is merely their "post-hoc rationalization," which this Court should disregard as improper.[63]

Apparently in an attempt to get their square peg "alter ego" theory to fit into a round hole of debarment, Defendants' counsel leap to the conclusion that, because Canales is the "alter ego" of M Squared, FAR § 9.406-5(a) applies in the instant case.[64]  As an initial matter, once again, this attempt to rely on "alter ego" based on FAR § 9.406-5(a) as a basis for debarment of M Squared (or Canales, for that matter) is wholly unsupported by any evidence in the Administrative Record, not cited as a basis for debarment by the debarring official,[65] and not relied upon by either of the Government's witnesses in Defendants' Opp.  Thus, counsel's reliance on FAR § 9.406-5(a) is merely part of their "post hoc rationalization" for the debarment of M Squared, found only in Defendants' Opposition, and should be summarily rejected by this Court.[66]

Even if the Court chooses to consider whether FAR § 9.406-5(a) applies in this case, it is apparent upon a plain reading of the regulation that FAR § 9.406-5(a), by its terms, does not support any theory for imputing debarment to M Squared, let alone imputation on an "alter ego"

---

[62]    *See, e.g.*, Sharpe's Decl. at ¶ 5, where there is no mention of "alter ego," (instead, Defendant Sharpe merely states, "Ms. Canales represented in her submissions that she was the sole owner and operator of M Squared Strategies, Incorporated.  Also on June 27, 2006, I issued a Notice of Debarment to M Squared Strategies, Inc."), but which is cited by counsel as the basis for Defendants' "alter ego" theory of M Squared's debarment.  (Defendants' Opp. at p. 17).

[63]    *See Caiola v. Carroll*, 851 F.2d 395, 400, 1997 WL 488745 at *3 (D.C. Cir. 1988) (noting that where assertions are made without support in the administrative record, the court "will not address counsel's post hoc rationalizations") (citations omitted); *see also*, *West v. Red Samm Constr., Inc.*, 124 F.3d 227 (Fed. Cir. 1997) (rejecting government's "alter ego" argument when that argument was not raised at trial) (citations omitted).

[64]    Defendants' Opp. at p. 15.

[65]    *See* discussion of Defendant Sharpe's reliance on FAR § 52.209-5(a)(2) as a basis for debarring M Squared, *infra*, at pp. 13-14.

[66]    *See Caiola*, 851 F.2d at 400; *West*, 124 F.3d at 227.

theory.[67]  Instead, FAR § 9.406-5(a) applies to impute an individual's debarment to a corporate

contractor *only* when the conduct undertaken by the individual "*occurs in connection with the*

*individual's performance of duties for or on behalf of the contractor, or with the contractor's*

*knowledge, approval, or acquiescence.*" (emphasis added).  Thus, FAR § 9.406-5(a) cannot

apply to M Squared because the alleged conduct that occurred in this case was Canales's false

writing in June 2002, while she was employed at Treasury, which could not have occurred in

connection with Canales's performance of duties for or on behalf of M Squared.[68]  Indeed, M

Squared was engaged in active business at the time Canales made the false writing.  M Squared

was not even a government contractor in April 2004, when Canales pled guilty to making a false

writing in violation of 10 U.S.C. § 1018.[69]  Any other interpretation of FAR § 9.406-5(a),

especially those that the Government would have this Court make, would be contrary to the

unambiguous plain meaning of the provision, and cannot, for that reason alone, be viable.[70]

     Certainly, had Congress intended for the "Scope of debarment" section of FAR[71] to

apply to debar a contractor in a situation such as this one, where the principal of a contractor

committed a crime outside the scope of her employment with that contractor, it would have

provided for such a situation.  In fact, as discussed above, FAR § 52.209-5(a)(2) covers such a

situation.  FAR § 52.209-5(a)(2) provides only that a principal of a contractor shall disclose any

such past crimes on certifications submitted by a contractor during the solicitation process.

---

[67]     Notably, nowhere in FAR § 9.406-5(a) does the term "alter ego" appear.  It is also noteworthy that the term "alter ego" does not appear in any other FAR provision cited by Defendants.

[68]     *See* Plaintiffs' App. for PI at p. 3.

[69]     *Id.* at p. 4.

[70]     The plain meaning of the regulation should be given application.  *See District of Columbia Nat'l Bank v. D.C.*, 348 F.2d 808, 810, 121 U.S. App. D.C. 196 (D.C. App. 1965) (stating that the plain meaning doctrine must be given application, however hard or unexpected the particular effect, where unambiguous language calls for a logical and sensible result.); *see also Seattle-First Nat'l Bank v. Conaway*, 98 F.3d 1195, 1197 (9th Cir. 1996) ("It is a well-recognized rule of statutory construction that 'the plain meaning of the statute controls, and courts will look no further, unless its application leads to unreasonable or impracticable results.'") (citations omitted); *Castillo v. Usery, Sec. of Labor*, 1976 U.S. Dist. LEXIS 13151, *51 (N.D. Cal. 1976) ("Effect should be given to the natural and plain meaning of words in a rule or regulations.") (citations omitted).

[71]     FAR § 9.406-5.

Thus, to the extent FAR addresses this type of situation, it does so by requiring certifications concerning the principals of the contractor, which the Government may then consider in its decision to award a contract. However, the FAR is conspicuously silent as to debarment on such grounds or under the present facts.

Notwithstanding the foregoing, even if Defendants' "alter ego" theory of debarment for M Squared was legitimately culled from the FAR, which it was not, M Squared would be entitled to a due process hearing on whether it was, in fact, the "alter ego" of Canales.[72] Contrary to Defendants' assertion in Defendants' Opp., simply because someone is the sole owner of a company, it does not follow that the corporate veil should be pierced to find that the company is the "alter ego" of the owner. As an initial matter, in order to find that a corporation is the "alter ego" of a person, there must be grounds to pierce the corporate veil.

> Piercing a corporate veil is a task which a court undertakes reluctantly; there is a presumption of corporate regularity which usually requires the party seeking to have the corporate entity disregarded to come forward with a substantial showing that the corporation was really a dummy for the person sought to be held liable.[73]

Indeed, even the case cited in Defendants' Opposition, *Labadie Coal Co. v. Black*, 672 F.2d 92, 97 (D.C. Cir 1982), elucidates that control of a corporation is only one factor in deciding whether to pierce the corporate veil.[74] In *Labadie Coal*, the D.C. Circuit Court considered a variety of factors, including, *inter alia*, the amount of control, whether corporate minutes and records were maintained, whether the corporate formalities necessary for the issuance of stock were maintained, and whether there was commingling of funds in order to

---

[72]     *See Commercial Drapery Contractors v. U.S.*, 133 F.3d 1, 6 (D.C. Cir. 1998) ("[a]n agency may not impose even a temporary suspension without providing the "core requirements" of due process: adequate notice and a meaningful hearing.")

[73]     *Pardo v. Wilson Line of Wash., Inc.*, 414 F.2d 1145, 1149-50 (D.C. Cir. 1969).

[74]     Defendants' Opp. at p. 15.

determine whether the corporate veil should be pierced.[75]  In the instant matter, other than

Canales owning 100% of M Squared, there is not even so much as a scintilla of evidence in the

Administrative Record or in the papers filed with this Court to suggest that M Squared fails to

meet any of the factors in the *Labadie Coal* analysis.  This is a "theory" that was never, including

up to today, asserted by the DO and was never the subject of any fact finding investigation.

Thus, Defendants cannot now argue, post hoc, that M Squared is the "alter ego" of Canales

without, at a minimum, the actual assertion of such a claim, pre-debarment, and a due process

hearing at the agency level.[76]  The agency may not avoid such a procedure, as there is no civil or

criminal court decision asserting, let alone holding, that M Squared is the "alter ego" of Ms.

Canales.[77]

In sum, Defendants' theory of debarment as to M Squared by imputation is misplaced.

Clearly, Defendant Sharpe's basis to debar M Squared is without merit and should not be

permitted to stand as a matter of law.  Even worse, Defendants' "alter ego" theory is a last

minute futile attempt to substitute a wholly new ground for debarring M Squared in order to

bolster the putative justification for the IG's two false reports to Congress.  The debarment of M

Squared is the very definition of a capricious act by the Government, and this Court should not

abide such indecorous conduct.

### C.    The Debarment of Canales Has No Rational Basis And Is Contrary to the Applicable Regulations Since Canales Is Not, and Has Never Been, A "Contractor" Within the Meaning of the FAR.

"Debarment under FAR [§] 9.406-2, by its terms, applies only to a contractor."[78]  Canales

is not and has never been a contractor under the FAR; only her company, M Squared, contracts

---

[75]    *See Labadie*, 672 F.2d at 96-99.
[76]    *See Commercial Drapery Contractors v. U.S.*, 133 F.3d at 6.
[77]    *See id.*
[78]    *Caiola*, 851 F.2d at 400.

with the Government.[79]  Notwithstanding this threshold issue, Defendant Sharpe maintained that,

under FAR §§ 9.406-2(a)(1) and (5), cause for debarment of Canales existed because Canales

was "convicted of violating [sic] U.S.C. § 1018, making a false writing in connection with an on-

going procurement."[80]

That Canales is not a contractor under the FAR cannot reasonably be challenged.  Indeed,

Defendants do not challenge this fact.  Rather, they simply leap to the conclusion that Treasury

can debar Canales without providing any justification in their Opposition for such a

determination.  Not only is Defendants' Opposition devoid of any consideration of whether

Canales is a contractor under FAR, but so too is the Administrative Record.  Thus, the debarment

of Canales was an arbitrary and capricious act and contrary to the law.

However, even if the Court determines, *arguendo*, that Canales is a contractor within the

definition of that term provided by FAR, because Defendants base the debarment of Canales on a

crime that Canales did not commit, her debarment cannot stand.  In the Notice of Debarment,

Defendant Sharpe stated that the cause for the debarment of Canales was her conviction for

making a false writing in connection with an ongoing procurement.[81]  As explained, Canales was

not convicted of any crime whatsoever that related to an ongoing procurement.[82]  The

determinations by the DO and the OIG that Canales was "convicted of violating U.S.C. § 1018

[for] making a false statement in connection with an ongoing procurement" and that she

"directed a consulting firm under contract with the Department to secure a $1.5 million

subcontract with a company owned by the CIO's friend, as part of (or in exchange for), a $5.8

million contract that Treasury awarded to the consulting firm [and] accepted various gratuities

---

[79]    Canales Aff. Attached as Exhibit 1 to Plaintiffs' Motion for Reconsideration [Dkt. No. 5].
[80]    AF CAN 0011.
[81]    AF CAN 11.
[82]    *See* discussion *supra* at pp. 8-9 regarding U.S. Attorney Sklamberg's statement distinguishing Canales's conviction for making a false writing from any crime relating to bribery, gratuities or corruption statutes.

including jewelry and the use of a time-share rental property," respectively, are demonstratively false.  The U.S. Attorney's Office flatly stated that the § 1018 misdemeanor conviction was not related to any procurement actions and that there is "no allegation Ms. Canales broke any of the bribery or gratuity laws or corruption offenses."[83]

The only possible explanation for their failure to understand the U.S. Attorney's clear statements in Court is that the OIG and the DO are acting in furtherance of a capricious vendetta against Canales that began with the OIG's first false report to Congress, and continues to this day.  Either way, because the debarment against Canales relies on the premise that Canales committed a crime that, in reality, she did not commit, the debarment is arbitrary, capricious, and contrary to law.  Consequently, this Court should strike the debarment against Canales.

## II.    IRREPARABLE HARM

### A.    M Squared Will Suffer Irreparable Harm.

The Defendants' claims that M Squared will not suffer irreparable harm if the debarment is not lifted during the pendency of this case are without merit.  Essentially, Defendants argue that M Squared will only suffer monetary loss as a result of the debarment, and, thus, injunctive relief would be improper.[84]  Defendants admit, however, that a finding of irreparable harm would be proper when an agency's challenged action would cause the business to cease to exist.[85]  Canales has made clear that the debarment of M Squared would cause its certain demise.[86]  M Squared does not have any contracts with the private sector and, even though it did at one time have contracts in the private sector, M Squared is not in the business of contracting in the private

---

[83]    AR CAN 0133 and 1044-1045.
[84]    Defendants' Opp. at pp. 19-20.
[85]    Defendants' Opp. at 19.
[86]    Plaintiffs' App. for PI at p. 9.

sector any longer.[87]  Simply put, M Squared will be forced to terminate its employees and cease

to exist should its debarment stand.[88]  This is irreparable harm under any definition.[89]

Moreover, Defendants cite to at least two cases supporting its proposition that, where loss

of income can ultimately be recovered, it is not considered irreparable harm.[90]  In those cases,

the parties have direct contracts with each other.  In this case, however, because M Squared does

not have any contracts with Treasury, M Squared is left without a legal remedy.  It cannot sue the

Department of Energy or the other agencies with which it has contracts for Treasury's wrongful

debarment.  In spite of the facts that Treasury does not have an interest in debarring M Squared

(because it does not have any contracts with M Squared), and that Treasury did not consult with

the other agencies before making its decision, Treasury saw fit to debar M Squared.

Consequently, M Squared is left without a monetary remedy in this case because M Squared

does not have any contract with Treasury upon which to sue Treasury for breach.

As a result, it is doubtful that the DO has any jurisdiction to debar either Plaintiff.  FAR §

9.402(c) explains that "when more than one agency has an interest in the debarment … of a

contractor, consideration shall be given to designating one agency as the lead agency for making

the decision."  In this case, it is undisputed that M Squared has multiple contracts with various

federal agencies, none of which are with Treasury.  Since not one of the agencies with which M

Squared contracts has indicated any dissatisfaction with M Squared's performance of those

---

[87]     M Squared's App. for TRO at p. 4.
[88]     *Id.*
[89]     *See Art-Metal USA, Inc. v. Solomon*, 473 F. Supp. 1, 4 (D.D.C. 1978) (finding irreparable harm where business would be destroyed and noting that the Court "would have to be blind to the realities to conclude" contractor could shift its business from public to private contracting at a "moment's notice.").
[90]     Defendants' Opp. at p. 19, citing *Sampson v. Murray*, 415 U.S. 61, 90 (1974) and *Wisconsin*, 758 F.2d at 674 [sic].

contracts or initiated debarment proceedings, it is doubtful that Treasury has the jurisdiction to do so here.[91]

Finally, Defendants argue that, notwithstanding the debarment, under FAR 9.406-1(c), M Squared may obtain waivers from agency heads in order to continue contracting with the Government.[92]  This argument is unavailing in light of Canales's testimony that the contracts that M Squared currently has will be transitioned to a different contractor.[93]  FAR 9.406-1(c) is simply not a realistic option for M Squared's survival under the present circumstances.  Thus, Defendants' argument that M Squared will not suffer irreparable harm is baseless and should be rejected.

### B.    Canales Will Suffer Irreparable Harm.

Defendants allege that Canales likewise will not suffer irreparable harm if the debarment is not lifted during the pendency of the case.[94]  Relying on *Sampson v. Murray*, 415 U.S. 61, 91-92 (1974) and *Veitch v. Danzig*, 135 F. Supp.2d 32, 36-37 (D.D.C. 2001), Defendants maintains that Canales's assertion of damage to her reputation does not establish irreparable harm.[95]  However, neither of these cases refer to damage to reputation in the context of a debarment.  Rather, those cases apply to employees of the Government who have been fired from their jobs.[96]  The stigma of debarment, however, is different from that of being simply discharged from the Government as its employee.  FAR § 9.402(b) clarifies the "serious nature" of debarment and, thus, the harm to one's reputation done by debarment exceeds that of a garden-variety separation from the Government's employ.

---

[91]    Plaintiffs' App. for PI at p. 9.
[92]    Defendants' Opp. at p. 20.
[93]    M Squared's App. for TRO at pp. 3-4.
[94]    Defendants' Opp. at pp. 20-21.
[95]    *Id.*
[96]    *Sampson*, 415 U.S. at 63; *Veitch*, 135 F. Supp.2d at 34.

In *Old Dominion Dairy Products, Inc. v. Secretary of Defense*, 631 F.2d 953, 966 (D.C. Cir. 1980), the D.C. Circuit Court held that, in the context of a defamation case against the Government, a defamatory publication that the contractor lacked integrity joined with "accompanying loss of government employment" and the "foreclosure from other employment opportunity" created a liberty interest beyond that of a claim defamation alone.  Similarly, in this case, it is not simply the defamatory comments continually and consistently proffered by the Government throughout every phase of this case, but the loss of the ability to be employed by a company wishing to contract with the Government, and the stigma associated with a debarment that creates the irreparable harm to Canales.[97]

## III.  THE GOVERNMENT AND PUBLIC INTERESTS WILL BE SERVED IF INJUNCTIVE RELIEF IS GRANTED.

Defendants' arguments that the Government and the public will be harmed should the debarments be "set aside" are unavailing.[98]  In making its claim that the Government would suffer a "real and substantial harm," Defendants claim that M Squared and Canales are not presently responsible contractors.[99]  Instead, it is the Governmental agencies that contract with M Squared that will be harmed if they have to transition those contracts from M Squared to other contractors that they otherwise would not have transitioned, as not a single agency with which M Squared contracts has, prior to M Squared's wrongful debarment, expressed any dissatisfaction with M Squared's performance.[100]

---

[97]     *See Caiola*, 851 F.2d at 401 (finding that "the prospect of a lingering stigma" kept the contractor's case vital even after the three year period of debarment had run its course).

[98]     Defendants' Opp. at p. 21-22.

[99]     *Id.*

[100]     M Squared's App. for TRO at pp. 5, 9-10.

Finally, because Defendants' position regarding the alleged harm to the public is similar to its argument regarding the harm to the Government, it should also be rejected.[101]  The only real harm to the public that would occur in this case, in addition to the cost taxpayers would shoulder if the contracts M Squared currently has with the Government must be transitioned to other contractors, is to allow the Government to continue to perpetrate this egregious wrong on M Squared and Canales.

DATED: August 28, 2006                    Respectfully submitted,


                                          ___/s/___Steven D. Cundra_____
                                          By:  One of their attorneys
                                          Steven D. Cundra, D.C. Bar No. 374074
                                          Amy Epstein Gluck, D.C. Bar No. 453525
                                          Nicholas M. Beizer, D.C. Bar No. 485894
                                          **HALL, ESTILL, HARDWICK, GABLE,
                                          GOLDEN & NELSON, P.C.**
                                          1120 20th Street, N.W.
                                          Suite 700, North Building
                                          Washington, D.C. 20036
                                          (202) 973-1200
                                          (202) 973-1212 (fax)

                                          *Attorneys for Plaintiffs*

---

[101]    Defendants' Opp. at p. 22