**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

```
_____
                               )
MARIA CANALES, et al.,         )
                               )
        Plaintiffs,            )
    v.                         )    Civil Action No.
                               )    06-1330 (GK)
HENRY M. PAULSON,              )
    Secretary of the           )
    Treasury, et al.,          )
                               )
        Defendants.            )
_____)
```

<u>**MEMORANDUM OPINION**</u>

Plaintiffs, Maria Canales and M Squared Strategies, Inc. ("M Squared"), bring this case against Henry M. Paulson, Secretary of the Treasury, Thomas A. Sharpe, Jr., Director of the Office of the Procurement Executive, U.S. Department of the Treasury, and Dennis S. Schindel, Acting Inspector General, U.S. Department of the Treasury, challenging a June 27, 2006 Debarment Notice issued by the United States Department of the Treasury. That Notice precludes them from contracting with the federal government for a period of three years.

This matter is currently before the Court on Plaintiff M Squared's Application for Temporary Restraining Order [Dkt. No. 18]. Upon consideration of the Application, Opposition, Reply, and the entire record herein, and for the reasons stated below, Plaintiff's Motion is hereby **granted**.

I.    **BACKGROUND**

    **A.**   **Facts**[1]

    Between 1999 and 2002, Maria Canales was employed by the United States Department of the Treasury ("Treasury" or the "Department") and served in various capacities at that agency. For a brief period in 2002, she held the title Acting Deputy Assistant Secretary and Acting Chief Information Officer. She resigned in October 2002 and founded M Squared shortly thereafter. A Maryland Corporation, M Squared provides management consulting services primarily to government agencies. Canales is the sole shareholder of M Squared and serves as its Chief Executive Officer.

    In October 2001, while Canales was still employed at Treasury, the Department allocated $5.7 million for contracts relating to cyber-security software and consulting services. At that time, John M. Neal, an individual with whom Canales had been acquainted for several years, was working as a consultant for companies seeking those contracts. While the Department was considering various bids, including bids from companies Neal was representing, Canales and her husband vacationed in Malta with Neal and his companion and stayed at a time-share property belonging to Neal's companion. Subsequently, Canales received a valuable vase and several emerald chips from Neal. In March 2002, Treasury awarded

---

    [1] Unless otherwise specified, the Court cites only facts that are undisputed by the parties.

a sole source subcontract worth $1.5 million to one of the companies Neal represented.  Canales signed the sole source justification for that subcontract.

Later in March 2002, Treasury's Office of the Inspector General ("OIG") began investigating allegations that there was a connection between Canales's relationship with Neal and the award of a sole source subcontract to Neal's client.  In June 6, 2002, a representative from OIG interviewed Canales regarding the gifts she received from Neal.  In the course of that interview, Canales made false statements, including denying that she received emerald chips, which were later memorialized in an affidavit she signed.

Those false statements led the U.S. Attorney for the District of Columbia to file a one-count Information against Canales in April 2004, charging her with Making a False Writing in violation of 18 U.S.C. § 1018.  Canales subsequently pleaded guilty to that misdemeanor offense and was sentenced to a term of probation.  Her plea agreement, and the Government's allocution at her sentencing, made clear that no connection had been established between the gifts Canales received and the contract Neal's client won.  The Government stated in its allocution that there was "no allegation that Canales broke any of the bribery or gratuity laws or corruption offenses."  See Trans. of Canales Sentencing at 5.

In April 2004, Treasury's OIG published its semi-annual report to Congress.  In that document, the OIG inaccurately reported that,

as a result of its investigation, Canales had voluntarily agreed to a lifetime debarment from contracting with the federal government. The OIG repeated that inaccurate statement in its next semi-annual report to Congress, in October 2004. Defendants concede that OIG's statements were false and represent that OIG intends to correct them in its upcoming semi-annual report to Congress, due to be published in October 2006. See Defs.' Opp'n and Mot. for Summ. J. at 6-7.

In November 2005, Thomas Sharpe, Director of Treasury's Office of the Procurement Executive, initiated proceedings to debar Canales. She was represented by counsel during those proceedings, and had several opportunities to make legal arguments and present factual documentation in opposition to the proposed debarment.

By Notice dated June 27, 2006, Sharpe informed Canales that he had decided to impose debarment on her, effective immediately. The debarment, he explained, would apply "throughout the executive branch of the Government" for a period of three years. See Admin. R. at CAN0012. As grounds for his action, Sharpe cited Canales's "conviction of a criminal offense," specifically, "making a false writing in connection with an ongoing procurement." See id. at CAN0011. He further explained that M Squared would be debarred for the same period on the ground that Canales is its "sole stockholder and Chief Executive Officer," and therefore a "principal" of the corporation. Id. at CAN0012. Sharpe also sent a separate

-4-

Debarment Notice to M Squared, addressed to the attention of Canales.

At the time the debarment took effect, Plaintiffs' entire business consisted of four contracts with various federal agencies for management consulting services.[2]  One of those contracts was terminated on July 31, 2006, following the denial of Plaintiffs' first Motion for Temporary Restraining Order/Preliminary Injunction.  Of the remaining three contracts, two are funded through September 2006 and one is funded through November 2006.  Plaintiffs represent that unless the Court grants temporary injunctive relief regarding the three remaining contracts, the various contracting agencies will "transition" the contracts to other service providers within days.  See Pls.' Mot. for Prelim. Inj. at 8.

   **B.    Procedural History**

Plaintiffs filed their Complaint, together with a Motion for Temporary Restraining Order and Preliminary Injunction [Dkt. No. 2], on July 28, 2006.  Finding that Plaintiffs had not established a substantial likelihood of success on the merits, the Motions Judge presiding that day denied their Motion for a Temporary

---

[2]    When applying for each of these contracts, Canales disclosed her misdemeanor conviction to the relevant agencies. There has been no allegation that either she or M Squared concealed or misrepresented that conviction while operating as a government contractor.  None of the contracts were with the Department of the Treasury.

Restraining Order but left open the possibility that a Preliminary Injunction could issue after more comprehensive briefing of the issues.  <u>See</u> Dkt. No. 4.  On August 9, 2006, Plaintiffs filed an Application for Preliminary Injunction, which remains pending.

On August 21, 2006, Plaintiff M Squared filed the instant Application for Temporary Restraining Order [Dkt. No. 18], solely on its own behalf.  M Squared represents that this Application is necessary "to preserve the status quo until the Court can rule on the pending Application for P[reliminary] I[njunction]," which was filed on behalf of both Plaintiffs.  <u>See</u> Pl.'s Application for TRO [Dkt. No. 18] at 1 (hereinafter "M Squared's App. for TRO").  Defendants responded on August 23, 2006 [Dkt. No. 21] and Plaintiff filed its Reply on August 28, 2006 [Dkt. No. 25].

## II.  STANDARD OF REVIEW

It is well-settled that the granting of preliminary injunctive relief is an extraordinary measure, and that the power to issue such exceptional relief "should be sparingly exercised."  <u>Dorfmann v. Boozer</u>, 414 F.2d 1168, 1173 (D.C. Cir. 1969) (internal citation omitted).  The same standards apply for both temporary restraining orders and preliminary injunctions.  <u>Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.</u>, 559 F.2d 841, 843 (D.C. Cir. 1977).

To obtain a temporary restraining order, a plaintiff bears the burden of demonstrating: "1) a substantial likelihood of success on the merits, 2) that [plaintiff] would suffer irreparable injury if

-6-

the injunction is not granted, 3) that any injunction would not substantially injure other interested parties, and 4) that the public interest would be served by the injunction." <u>Katz v. Georgetown Univ.</u>, 246 F.3d 685, 687-88 (D.C. Cir. 2001).

Plaintiffs ultimately are not required to prevail on each of these four factors. Rather, the factors "interrelate on a sliding scale and must be balanced against each other." <u>Serono Labs, Inc. v. Shalala</u>, 158 F.3d 1313, 1318 (D.C. Cir. 1998). "If the arguments for one factor are particularly strong, a temporary restraining order may issue even if the arguments in other areas are rather weak." <u>CityFed Fin. Corp. v. Office of Thrift Supervision</u>, 58 F.3d 738, 746 (D.C. Cir. 1995). Injunctive relief may be justified "where there is a particularly strong likelihood of success on the merits even if there is a relatively slight showing of irreparable injury." <u>Id.</u> Conversely, when the other three factors strongly favor interim relief, a court may grant injunctive relief when the moving party has merely made out a "substantial" case on the merits. <u>Holiday Tours</u>, 559 F.2d at 843-45. In sum, injunctive relief may be granted "with either a high probability of success and some injury, or vice versa." <u>Cuomo v. United States Nuclear Regulatory Comm'n</u>, 772 F.2d 972, 974 (D.C. Cir. 1985).

III. **ANALYSIS**

    A.   **M Squared Will Suffer Irreparable Harm if Its Current Contracts Are Terminated While the Court Considers Plaintiffs' Application for Preliminary Injunction**

As noted above, M Squared's business currently consists of three government contracts, all of which will be "transitioned" to other contractors within weeks if the debarment is enforced. In the event that such transitions occur, M Squared claims that it would "be forced to terminate all of its employees, close its office, and cease to exist." M Squared's App. for TRO at 9.

Generally, economic loss does not "in and of itself, constitute irreparable harm" justifying emergency injunctive relief. Wisconsin Gas Co. v. Federal Reg. Comm'n et al., 758 F.2d 669, 674 (D.C. Cir. 1985). However, "monetary loss may constitute irreparable harm . . . where the loss threatens the very existence of movant's business." Id. (quoting Holiday Tours, 559 F.2d at 843 n.2).

There can be no question that this is a case where economic loss does constitute irreparable harm. Without the three contracts it currently holds, M Squared will have no source of revenue to keep itself afloat. While M Squared did at one time provide management consulting services to private entities, a fact the Government emphasizes, it has not done so for at least two years. See Canales Decl. ¶ 9; Defs.' Opp'n and Mot. for Summ. J. at 20. Government contracting has been its sole business, and only source

-8-

of income, since 2004. Accordingly, it cannot be seriously disputed that losing the three contracts it currently holds, which account for 100% of its business, would constitute irreparable harm to M Squared.

**B.    M Squared Has Presented a New Legal Argument that Appears to Have Substantial Merit**

In the instant Application for a Temporary Restraining Order, M Squared raises an argument—applicable only to it—that was not presented in the first TRO/PI Motion. Specifically, M Squared now argues that the "sole ground" Sharpe cited for its debarment was Canales's criminal conviction. M Squared contends that such an "imputation theory" can constitute grounds for debarment of a corporate entity only in limited circumstances that are not present in this case. <u>See</u> M Squared's App. for TRO at 8. The Government counters that because M Squared is wholly owned and completely controlled by Canales, Sharpe lawfully pierced its corporate veil and properly extended the debarment of Canales to M Squared. <u>See</u> Defs.' Opp'n and Mot. for Summ. J. at 15.

The Federal Acquisition Regulations (the "FAR" or the "Regulations") govern debarment of government contractors. <u>See</u> 48 C.F.R. §§ 9.400 <u>et</u> <u>seq.</u>. There are numerous grounds for debarment, including a contractor's "conviction of or civil judgment for," <u>inter</u> <u>alia</u>: "fraud or a criminal offense in connection with (i) obtaining, (ii) attempting to obtain, or (iii) performing a public

-9-

contract or subcontract;" "commission of embezzlement, theft, forgery, bribery, falsification or destruction of records, making false statements, tax evasion, or receiving stolen property;" and "commission of any other offense indicating a lack of business integrity or business honesty that seriously and directly affects the present responsibility of a Government contractor or subcontractor." Id. §§ 9.406-2(a)(1), (3), (5).

Where the contractor is a corporation rather than an individual, the "fraudulent, criminal, or other seriously improper conduct of any officer, director, shareholder, partner, [or agent] . . . may be imputed to the contractor when the conduct occurred in connection with the individual's performance of duties for or on behalf of the contractor or with the contractor's knowledge, approval, or acquiescence." Id. § 9.406-5(a). In all cases, however, debarment may be imposed "only in the public interest for the Government's protection and not for purposes of punishment." Id. § 9.402(b).

On its face, the FAR does allow an individual's debarment to be imputed to a corporation in some cases. See 48 C.F.R. § 9.406-5(a). As M Squared points out, however, this may not be such a case. The Regulations provide that a corporate principal or agent's criminal or fraudulent conduct may be imputed to the corporation itself if such conduct "occurred in connection with the individual's performance of duties for or on behalf of" the

-10-

corporation or with its "knowledge, approval, or acquiescence."
Id. Here, however, Canales's criminal conduct occurred while she
was still an employee at Treasury, and thus before her career as a
government contractor had begun and before M Squared had even been
incorporated. That conduct therefore could not have occurred "in
connection with" the performance of duties related to M Squared or
with its "knowledge, approval, or acquiescence."

The Government argues that, notwithstanding the above-quoted
language from FAR Section 9.406-5(a), the debarring official,
Sharpe, recognized that M Squared was merely the "alter ego" of
Canales, and pierced its corporate veil in order to hold it
accountable for Canales's conduct. See Defs.' Opp'n and Mot. for
Summ. J. at 15-16. In the current preliminary procedural posture,
the Government's argument appears to be insufficient for three
reasons.

First, given that M Squared did not exist at the time of
Canales's misdeeds, the plain language of FAR Section 9.406-5(a)
suggests that there is real merit to M Squared's argument that its
debarment was unlawful. Second, the authorities Defendant cites in
support of its counter-argument that Sharpe properly pierced the
corporate veil in this case appear sparse and incomplete at best;
without a more thorough briefing and consideration of the issues
Defendant raises, the Court is not in a position to find that there
is a substantial likelihood that M Squared will not succeed on the

merits.  See id.

Third, the Debarment Notice Sharpe issued to M Squared does not reference FAR Section 9.406-5(a), which the Government now argues was the basis for its debarment.  Moreover, there appears to be no evidence in the Administrative Record supporting Government counsel's contention that Sharpe made a determination that M Squared was Canales's alter ego and based his decision on that finding.  Even where, as here, the Court is bound to review an administrative action according to the highly deferential standard embodied in the Administrative Procedure Act, see Robinson v. Cheney, 876 F.2d 152, 155 (D.C. Cir. 1989), it must consider only the rationale an agency gives for its actions and not "post hoc rationalizations by . . . government agency counsel."  Ace Motor Freight, Inc. v. I.C.C., 557 F.2d 859, 864 (D.C. Cir. 1977) (collecting authority).

Accordingly, the Court finds that there is at least a substantial possibility that M Squared can demonstrate, on the merits, that its debarment was unlawful.

**C.    The Issuance of a Temporary Restraining Order Pending the Court's Consideration of Plaintiffs' Application for Preliminary Injunction Will Cause No Appreciable Harm to the Government**

M Squared has requested temporary injunctive relief preventing the enforcement of its debarment until the Court decides Plaintiffs' pending Application for Preliminary Injunction, a

-12-

period of time that is unlikely to exceed fifteen or twenty days. Maintaining the status quo for this period of time, it argues, will not prejudice the Government and may, in fact, save it the trouble, disruption of services, and expense of finding new contractors to provide the services M Squared is currently providing. <u>See</u> M Squared's App. for TRO at 10-11. The Government disputes that contention and makes the important point that it is "under a statutory duty to do business with responsible contractors." Opp'n and Mot. for Summ. J. at 21. Because it has found that M Squared is not such a contractor, the Government contends that being forced to continue doing business with M Squared will cause it to breach that duty. <u>Id.</u> at 22.

While the Government's argument is far from frivolous, the relief sought here is extremely modest. At most, the government agencies with which M Squared currently does business—all of which contracted with M Squared for several years in full awareness of Canales's conviction—will be required to continue and complete their relationship with M Squared for three additional weeks. This cannot constitute meaningful harm, especially given the serious questions M Squared has raised concerning the validity of its debarment.

**D.    The Public Interest Favors Entry of Temporary Injunctive Relief**

This is not a case where the public interest weighs heavily in either direction. The denial of temporary injunctive relief,

however, would likely have the effect of driving a small, minority-owned company, with twenty employees, out of business.  The Court cannot see how such a result would serve the public interest, especially when there appears to be substantial merit to the legal arguments M Squared has presented.  As a result, although the public interest is far from a dispositive factor here, it too supports the entry of temporary injunctive relief.  Our Court of Appeals recognized in <u>Cuomo</u> that in some instances injunctive relief will be appropriate when there is a high probability of injury and "some" probability of success on the merits.  <u>See</u> <u>Cuomo</u>, 772 F.2d at 974 (noting that "a movant need not always establish a high probability of success on the merits" and that "[p]robability of success is inversely proportional to the degree of irreparable injury evidenced").  This is such a case.

**IV.  CONCLUSION**

Accordingly, for the foregoing reasons, Plaintiff M Squared's Application for Temporary Restraining Order [Dkt. No. 18] is hereby **granted.**

An Order will issue with this Memorandum Opinion.


August 30, 2006                     /s/_____
                                    Gladys Kessler
                                    U.S. District Judge


**Copies to**: **attorneys on record via ECF**

-14-