**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                          )
MARIA CANALES and M SQUARED               )
STRATEGIES, INC.,                         )
                                          )
        Plaintiffs,                       )
                                          )
v.                                        )     Civil Action No: 1:06CV01330 (GK)
                                          )
HENRY M. PAULSON,                         )
SECRETARY OF THE UNITED STATES            )
DEPARTMENT OF TREASURY *et al*.,          )
                                          )
        Defendants.                       )
_____)

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS'**
**CROSS MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Pursuant to Fed. R. Civ. P. 56 and LCvR 56.1, Plaintiffs Maria Canales ("Canales") and

M Squared Strategies, Inc. ("M Squared") (collectively, "Plaintiffs") hereby file Plaintiffs'

Memorandum of Points and Authorities in Support of Plaintiffs' Cross Motion for Summary

Judgment and in Opposition to Defendants' Motion for Summary Judgment.

## INTRODUCTION

On August 30, 2006, this Court issued an Order and Memorandum Opinion granting M

Squared's Application for Temporary Restraining Order [Dkt. No. 27 and 28].  In so doing, this

Court found that M Squared showed a substantial likelihood of success on the merits that the

ground relied upon by the Debarring Official (the "DO") at the United States Department of the

Treasury ("Treasury") for the debarment of M Squared was "unlawful."  Furthermore, this Court

questioned Defendants' use of post hoc rationalizations in attempting to justify their improper

debarment of M Squared when they raised a new theory of debarment for the first time in

Defendants' Motion for Summary Judgment ("Defendants' Motion") [Dkt. No. 21]. This new

theory of debarment, that M Squared is the "alter ego" of Canales, is absent from the Debarment

Notice, Administrative Record, and even the affidavits that Defendants included to support

Defendants' Motion for Summary Judgment.  It is also absent from any provision of the FAR,

both the FAR regulation cited in the Debarment Notice and the FAR regulation cited in

Defendants' Motion.

Despite the highly deferential standard regarding judicial review of agency decisions, as

set forth in the Administrative Procedure Act ("APA"), this Court determined that M Squared

had a "substantial possibility" of demonstrating that the debarment of M Squared was unlawful.[1]

Indeed, Defendants have not provided any factual or legal basis to suggest that, as a matter of

law, the debarment of M Squared is not void.  As the Administrative Record is devoid of any

legal or factual support for the debarment decision, M Squared is entitled to summary judgment

as a matter of law on its Complaint seeking permanent relief from the debarment.

In Plaintiff's Application for Preliminary Injunction [Dkt. No. 7], Canales demonstrated

that her debarment by Treasury is, similar to the debarment of M Squared, based upon unlawful

and improper considerations by the DO, which are unsupported by and contrary to the FAR.

Canales is not, and has never been, a government contractor within the meaning of the definition

provided by FAR § 9.403.  Thus, because Canales is not a contractor, she cannot as a matter of

law, be debarred.  Moreover, even if Treasury had determined that Canales was a contractor, the

DO's stated basis for her debarment, *i.e.*, that Canales was convicted of "making a false writing

in connection with an ongoing procurement" is simply false as is clearly demonstrated by the

official Court record of her criminal misdemeanor proceeding.

The continual vindictive efforts of both the Office of Inspector General ("OIG") and the

DO to characterize Canales's conviction as one for corruption, bribery, or the acceptance of a

---

[1]    Memorandum Opinion, dated August 30, 2006 at p. 12.

gratuity in connection with an ongoing procurement are undeniably false and unlawful, as Canales simply was not convicted of such a crime. Indeed, the statements of the Assistant United States Attorney (the "AUSA") at Canales's Arraignment and Sentencing Hearings make clear that Canales's conviction does not relate to corruption, bribery, or the acceptance of a gratuity in connection with an ongoing procurement. Thus, the debarment of Canales cannot stand and Canales is entitled to summary judgment as a matter of law.

Defendants' Motion for Summary Judgment should be denied for multiple reasons. First, it improperly introduces new evidence not contained in the Administrative Record of the Debarment Decision, Affidavits of the Treasury OIG and the Treasury DO and improper e-mail communications between their respective legal counsel that, so far, have been shielded from any discovery. It is axiomatic that one party cannot unilaterally submit "new evidence" into the Court record on a motion for summary judgment that has not be subjected to discovery by the opposing party and ask that the Court bar any discovery on this "new evidence" and simply grant their motion relying on this "new evidence". Either Defendants have to allow discovery on the "new evidence" or suffer having it stricken from the record. If this "new evidence" is allowed, consideration of Defendants' motion should be stayed until appropriate discovery is allowed to the Plaintiffs.

Secondly, this "new evidence" does not support a summary judgment finding for the Defendants. There is nothing in this "new evidence" or in the Administrative Record that would support a finding that the DO debarred M Squared on the new "alter ego theory," that he made any factual findings that M Squared is the alter ego of Ms. Canales or that the newly cited FAR regulation provides for an imputed debarment on such an "alter ego" theory. Nor does this "new evidence" provide any support for the DO's finding that Ms. Canales was a government

contractor subject to debarment proceedings or that her misdemeanor conviction was one for "corruption, bribery, or the acceptance of a gratuity in connection with an ongoing procurement."

The only points that this "new evidence" makes are (1) that Treasury was aware since at least August 2005 that the OIG publications to Congress concerning Ms. Canales were materially false but failed to correct those false and defamatory public statements, (2) that, instead, Defendants engaged in "fast action" in an attempt to cover up their misconduct and conceal their wrongful actions by debarring Plaintiffs to punish Ms. Canales and to preserve their own reputations. While Defendants attempt to conceal their furtive conduct by channeling their communications through their respective legal counsel, hardly an honorable practice for public officials and counsel to engage in, the fact of their improper conduct cannot be so easily concealed. While the Treasury OIG and the Treasury DO use different words, they continue to repeat, in concert, the same false statement: that Ms. Canales was convicted of criminal conduct in connection with ongoing procurement.

While asked by the Court for an explanation, Defendants have not even attempted to explain how such utterly shameless false and defamatory statements – (1) that Ms. Canales was convicted for corruption, bribery, or the acceptance of a gratuity in connection with an ongoing procurement and (2) that, as a result, she was debarred for life from doing business with the federal government -- came to be included in the two official and public Semi-Annual Reports to Congress. They offer no explanation. Rather, they simply attempt to obscure the issue by attempting to deny that the DO had any knowledge of these repeated false public statements by the Treasury OIG when he made his debarment decisions.

Even absent further discovery, it is clear that the debarment of M Squared and Ms. Canales was arbitrary, capricious, and contrary to law, and, accordingly, Plaintiffs' Cross Motion

for Summary Judgment should be granted and Defendants' Motion should be denied.  However,

if the Court determines that the issues cannot be considered as a matter of law on the Notices of

Debarment and the Administrative Record, and that the Defendants' "new evidence" is material

to a ruling on Defendants' Motion, then Plaintiffs' request the prior opportunity to take

appropriate discovery on the "new evidence" submitted with Defendants' Motion.

## BACKGROUND FACTS

On February 25, 2002, OIG initiated an investigation based on a complaint from a

confidential source that Canales, then the Treasury's Chief Information Officer ("CIO"), was

involved in unlawful procurement practices, to wit:  the receipt of gifts and personal vacations

from a personal friend ("Neal") in exchange for "greatly influencing" the sole source award of a

$5.7 Million IT contract to Booze Allen Hamilton ("BAH"), which included a $1.5 Million

subcontract to a company ("Enterasys, Inc.") "represented by Neal."[2]  In the course of the

investigation, OIG agents interviewed Canales on June 6, 2002, and she acknowledged that she

had received a vase from Neal, but she denied that she had accepted a personal gift of two blue

emerald chips, valued at $800.[3]  She also denied any connection between any gifts and the award

of the $5.7 Million BAH contract or BAH's subcontract with Enterasys, Inc.  This interview was

reduced to a written statement on that same day.[4]

The results of OIG's investigation were turned over to the Department of Justice for

criminal prosecution.  On April 13, 2004, the United States filed a one count Information against

Canales, charging her with a violation of 18 U.S.C. § 1018, making a false writing in connection

with her denial of her acceptance of the two emerald chips in her interview with the Treasury

OIG.  At the Arraignment Hearing on April 19, 2004, the AUSA gave a proffer of what the

---

[2]    Administrative Record, hereinafter "AR," CAN 0018 - 0019.
[3]    AR CAN 0019.
[4]    AR CAN 0042 - 0044.

evidence would have shown had the case gone to trial.[5]  After his proffer, Canales's counsel

noted, "there is no connection proffered by the United States Attorney's Office that connects any

procurement to those gifts."[6]  When asked to respond by the judge, the AUSA stated: "This is a

plea to Section 1018 *and we're not alleging a violation of the bribery or gratuity statute*, so that

statement I think does not detract from the factual proffer."[7]  Canales then entered her plea of

guilty to the misdemeanor violation.

On April 30, 2004, following the plea proceedings, Treasury's OIG published his Semi-

Annual Report ("SAR") to Congress for the period October 1, 2003 – March 31, 2004.

Inexplicably, the OIG *falsely reported that Canales had pleaded guilty to procurement fraud –

the acceptance of bribes and gratuities in exchange for the award of a $1.5 Million subcontract*:

### Former Acting Treasury CIO Debarred for Life for Making False Statements

A complaint filed with Treasury OIG alleged, as part of or in exchange for a $5.8 million [sic] contract for cyber-security related software and consulting services, Treasury's former Acting CIO directed the contractor to place a $1.5 million subcontract with a company owned by a friend of the CIO.  Our investigation revealed that, in return, the CIO received various gratuities including jewelry and use of a time-share rental property located in the Bahamas.  The former CIO agreed to plead guilty to making False Statements in Official Certificates or Writings (18 U.S.C. §1018) and to be debarred from doing business with the federal government for life.

To make these false statements more noticeable and as damaging as possible, the Treasury OIG

inserted a color photograph showing a sailboat anchored on a Caribbean island with a palm tree

in the foreground.[8]

On July 13, 2004, at Canales's sentencing hearing, AUSA Sklamberg directly refuted the

OIG's statements in the OIG's April 30, 2004 SAR, by informing the Court:

---

[5]     AR CAN 0129 - 0133.
[6]     AR CAN 0133.
[7]     AR CAN 0133.
[8]     Exhibit 5[Dkt. No. 9] to Plaintiffs' Application for Preliminary Injunction,  ("Plaintiffs' App. PI") [Dkt. No. 7] filed on August 9, 2006.

As the Court knows from reviewing the actual proffer upon which the parties agreed, this case stems from an investigation by the Inspector General's Office into activities by Ms. Canales. ***There ended up being no allegation that Ms. Canales broke any of the bribery or gratuity laws or corruption offenses.***

In the course of the investigation, however, Ms. Canales made a false written statement to the Inspector General…That false statement forms the basis, the false written statement, forms the basis to the misdemeanor to which Ms. Canales pled.[9]

Apparently displeased with the handling of its allegations by the Department of Justice and the Court, on October 29, 2004, the Treasury OIG *again* decided to re-publish the false and defamatory statements about Canales's misdemeanor conviction, this time publishing her full name in addition to her former position at Treasury:

### Former Acting Treasury CIO Sentenced to Making False Statement and Debarred for Life

In our March 2004 report (p.15), we reported Treasury's acting Chief Information Officer (CIO), Maya Canales, directed a consulting firm under contract with the Department to secure a $1.5 million subcontract with a company owned by the CIO's friend, as part of (or in exchange for), a $5.8 million contract that Treasury awarded to the consulting firm. That investigation revealed the acting CIO accepted various gratuities including jewelry and the use of a time-share rental property.

The former acting CIO pled guilty to making false statements in official Certificates or Writings (18 U.S.C. § 1018) and has been debarred for life from doing business with the federal government. In July 2004, the former action CIO was sentenced in United States District Court to 1 year probation, fined $2,500, and ordered to perform 25 hours of community service.[10]

This re-publication again falsely stated, contrary to the clear evidence of record in her criminal case, that Canales had pled guilty to criminal procurement fraud violations in connection with a $1.5 million sub-contract and had been debarred for life from doing business with the federal government.

---

[9]    AR CAN 0144-0145.

[10]    Exhibit 6 to Plaintiffs' App. PI [Dkt. No. 9].

On November 29, 2005, more than 19 months after the OIG's April 2004 public announcement of Canales's "Life-Time Debarment" for her "procurement fraud" conviction, the DO informed Canales, *for the first time*, that it was initiating debarment proceedings against her.[11]  Then, on June 27, 2006, the DO sent Notices of Debarment, effective for three years, to both Canales and M Squared.[12]  The Debarment Notice for Ms. Canales stated that:  "You were convicted of violating U.S.C. § 1018, making a false statement in connection with an ongoing procurement."  The Debarment Notice for M Squared referred to that of Ms. Canales, which simply stated:  "The debarment may also apply to your place of employment in the event you are employed as a "principal" as defined by the certification requirements under FAR 52.209-5(a)(2)."

On July 28, 2006, Plaintiffs filed a Complaint and Motion for Temporary Restraining Order and Preliminary Injunction to enjoin the debarment.  On August 30, 2006, this Court granted M Squared's Application for Temporary Restraining Order, finding that there was a "substantial possibility that M Squared can demonstrate, on the merits, that its debarment was unlawful."[13]  By this Motion, Plaintiffs demonstrate that the debarments of M Squared and Ms. Canales were in fact unlawful, and this Court should grant Plaintiffs summary judgment as a matter of law.

## **STANDARD OF REVIEW**

The standard for reviewing summary judgment motions is clearly established in Fed. R. Civ. P. 56, which states, in pertinent part, that summary judgment shall be granted as a matter of law if the moving party can prove that there is no genuine issue as to any material fact.[14]

---

[11]     AR CAN 0014-0015.
[12]     AR CAN 0011-0013.
[13]     Mem. Op. at p. 12.
[14]     *See* Fed. R. Civ. P. 56.

Summary judgment is appropriate only where the pleadings and supporting documentation marshaled "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[15]  To determine which facts are "material," a court must look to the substantive law on which each claim rests.[16]  A "genuine issue" is one whose resolution could establish an element of a claim or defense and, therefore, affect the outcome of the action.[17]

In order to prevail on a motion for summary judgment, the moving party must demonstrate, based on the pleadings, discovery, and any affidavits submitted, that there is no genuine issue as to any material fact and that it is thus entitled to judgment as a matter of law.[18]  To prevail on a motion for summary judgment, the moving party must show that the nonmoving party "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."[19]  By pointing to the absence of evidence proffered by the nonmoving party, a moving party may succeed on summary judgment.[20]

## ARGUMENT

I.    **THIS COURT SHOULD GRANT PLAINTIFFS' CROSS MOTION FOR SUMMARY JUDGMENT AND DENY DEFENDANTS' MOTION, AS THE DEBARMENT OF PLAINTIFFS IS CONTRARY TO THE FAR AND IS BASED ON A BLATANT MISREPRESENTATION OR MISREADING OF THE OFFICIAL RECORDS OF CANALES'S CRIMINAL CASE IN THE UNITED STATES DISTRICT COURT AS WELL AS THE USE OF A "POST HOC" ARGUMENT AND "EVIDENCE" ABSENT FROM THE ADMINISTRATIVE RECORD.**

---

[15]    Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).
[16]    *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).
[17]    *Celotex*, 477 U.S. at 322; *Anderson*, 477 U.S. at 248.
[18]    Fed. R. Civ. P. 56(c); *Burlington Insur. Co. v. Okie Dokie, Inc. et al.*, 398 F. Supp. 2d 147, 152 (D.D.C. 2005).
[19]    *Celotex*, 477 U.S. at 322.
[20]    *Id.*

**A.    Summary Judgment Should Be Granted to Plaintiff M Squared and Denied to Defendants As Defendants Lack A Lawful Basis To Debar M Squared, And Their Cited Bases For Its Debarment Are Contrary To Law And The Regulations They Cite In Support Of The Debarment.**

Defendants' Motion essentially alleges two theories for debarring M Squared,[21] which both exhibit the arbitrary and capricious nature of Defendants' actions in this case, are contrary to law, and are unsupported by the record. The first theory espoused by Defendants for debarring M Squared is found in the Debarment Notice sent to M Squared (which refers M Squared to the Debarment Notice sent to Canales). In the Debarment Notice, Defendants claim that M Squared is debarred simply by the fact that Canales's debarment is imputed to it by FAR § 52.209-5(a)(2).[22] The second theory, which is raised for the very first time in Defendants' Motion only, is that M Squared is the "alter ego" of Canales and may be properly barred on that basis pursuant to FAR § 9.406-5(a).[23]

In its Memorandum Opinion on M Squared's TRO, this Court rejected both of Defendants' arguments.[24] Because Defendants' theories as to the bases for the debarment of M Squared contradict the applicable regulations and are unsupported by the Administrative Record, Defendants' Motion fails, and summary judgment should be granted to M Squared and denied to Defendants.

    1.    Defendants' New "Alter Ego" Imputation Theory Under FAR § 9.406-5(a) Does Not Provide a Basis for the Debarment of M Squared.

In their Motion, Defendants assert for the first time that M Squared should be debarred because it is the "alter ego" of Canales and, therefore, Canales's debarment may be imputed to M Squared under FAR § 9.406-5(a). Counsel's "alter ego" theory is not mentioned anywhere in the

---

[21]    AF CAN 0011-12; Defendants' Motion at p. 15.
[22]    AF CAN 0011-13.
[23]    Defendants' Motion at p. 15.
[24]    Mem. Op. at pp. 11-12.

Administrative Record, the Debarment Notices, or even in the affidavit and declaration attached

to Defendants' Motion, which counsel cites to as the sole basis for asserting their "alter ego"

theory.[25]  This theory was created from whole cloth by Defendants' counsel and is merely "post

hoc rationalization," which this Court should disregard as improper and unsupported.[26]   Indeed,

this Court recognized:

> there appears to be no evidence in the Administrative Record supporting
> Government counsel's contention that Sharpe made a determination that M
> Squared was Canales's alter ego and based his decision on that finding.[27]

This Court, and others, squarely reject such "post hoc" arguments.[28]  In *Ace Motor*

*Freight, Inc. v. Interstate Commerce Comm'n*, 557 F.2d 859, 181 U.S. App. D.C. 236 (D.C. Cir.

1977), aptly cited to by this Court in its Opinion, the D.C. Circuit Court opined:

> We may uphold an agency's decision only upon rationales that may be discerned therein.
> *Post hoc* rationalizations by imaginative government counsel do not suffice.
>         …
> As to the argument on appeal that there was a "showing" that no existing carrier was
> already conducting operations to the several destination states granted to Trehan, it may
> fairly be characterized as *post hoc* hallucination for the only showing was exactly to the
> contrary.[29]

In sum, this attempt to rely on "alter ego" based on FAR § 9.406-5(a) as a basis for debarment of

M Squared (or Canales, for that matter) is wholly unsupported by any evidence in the

---

[25]     The only "authority" cited by counsel as the basis for Defendants' "alter ego" theory of M Squared's debarment, is Sharpe's Decl. at ¶ 5. (Defendants' Motion at p. 17).  However, there is no mention of "alter ego" in the cited paragraph.  Instead, Defendant Sharpe merely states, "Ms. Canales represented in her submissions that she was the sole owner and operator of M Squared Strategies, Incorporated.  Also on June 27, 2006, I issued a Notice of Debarment to M Squared Strategies, Inc."  Clearly, the statement in the Declaration does not support the statements in the Defendants' brief.

[26]     *See Caiola v. Carroll*, 851 F.2d 395, 400, 1997 WL 488745 at *3 (D.C. Cir. 1988) (noting that where assertions are made without support in the administrative record, the court "will not address counsel's post hoc rationalizations") (citations omitted); *see also, West v. Red Samm Constr., Inc.*, 124 F.3d 227 (Fed. Cir. 1997) (rejecting government's "alter ego" argument when that argument was not raised at trial) (citations omitted).

[27]     Mem. Op. at p. 12.

[28]     Mem. Op. at pp. 11-12.

[29]     *Id.* at 864.

Administrative Record, not cited as a basis for debarment by the debarring official,[30] not relied

upon by either of Defendants' witnesses in the affidavit and declaration submitted with

Defendants' brief, and preliminarily rejected by this Court. It is merely a post hoc rationalization

or hallucination of Defendants' counsel, which this Court should reject as a matter of law.

Accordingly, summary judgment on behalf of M Squared should be granted and Defendants

motion should be denied.

Further, FAR § 9.406-5 is a comprehensive regulatory scheme which covers the universe

of situations (and the requirements necessary to be found under each such situation) where

debarment may be imputed: a) imputation from an individual officer or director to the corporate

contractor; b) imputation from a corporate contractor to the individual officer or director; and c)

imputation of one joint venturer to another.[31] There is simply no provision for, or contemplation

of, an "alter ego" theory of debarment contained in the FAR regulations that govern disbarment

by imputation. Moreover, the FAR regulation that does provide for imputation of a debarment

from an individual to the corporate contractor is clearly inapplicable here. (*See* Section I.A.2,

*infra*).

Even assuming, arguendo, that FAR provided for debarment on an "alter ego" theory

(though it clearly does not, and, in any event, the Administrative Record contains no such

finding), simply because someone is the sole owner of a company, contrary to Defendants'

assertion, it does not follow that the corporate veil should be pierced so as to find that the

---

[30]     *See* discussion of Defendant Sharpe's reliance on FAR § 52.209-5(a)(2) as a basis for debarring M Squared, *infra*, at pp. 13-14.
[31]     9.406-5(a) - (c).

company is the "alter ego" of the owner. [32]  As an initial matter, in order to find that a

corporation is the "alter ego" of an individual, there must be grounds to pierce the corporate veil.

> Piercing a corporate veil is a task which a court undertakes
> reluctantly; there is a presumption of corporate regularity which
> usually requires the party seeking to have the corporate entity
> disregarded to come forward with a substantial showing that the
> corporation was really a dummy for the person sought to be held
> liable.[33]

Indeed, even the case cited in Defendants' Motion, *Labadie Coal Co. v. Black*, 672 F.2d

92, 97 (D.C. Cir 1982), elucidates that control of a corporation is only one factor in deciding

whether to pierce the corporate veil.[34]  In *Labadie Coal*, the D.C. Circuit Court considered a

variety of factors, including, *inter alia*, the amount of control, whether corporate minutes and

records were maintained, whether the corporate formalities necessary for the issuance of stock

were maintained, and whether there was commingling of funds in order to determine whether the

corporate veil should be pierced.[35]  In addition, the alter ego doctrine permits veil piercing only

"where the stockholder and corporation have not maintained separate identities and 'adherence to

the corporate fiction [would] sanction a fraud, promote injustice, or lead to evasion of legal

obligations.'"[36]

In the instant matter, other than Canales owning 100% of M Squared, there is not even so

much as a scintilla of evidence in the Administrative Record, or in the papers filed with this

Court, to suggest that M Squared fails to meet any of the factors in the *Labadie Coal* analysis, to

find that Canales and M Squared have not maintained separate identities, or to find that failing to

---

[32]      *See Commercial Drapery Contractors v. U.S.*, 133 F.3d 1, 6 (D.C. Cir. 1998) ("[a]n agency may not
impose even a temporary suspension without providing the "core requirements" of due process:  adequate notice and
a meaningful hearing.")

[33]      *Pardo v. Wilson Line of Wash., Inc.*, 414 F.2d 1145, 1149-50 (D.C. Cir. 1969).

[34]      Defendants' Motion at p. 15.

[35]      *See Labadie*, 672 F.2d at 96-99.

[36]      *Pel-Star Energy, Inc. v. U.S. Dep't of Energy*, 890 F. Supp. 532, 542-43 (W.D. La. 1995) (citations
omitted).

pierce the corporate veil would sanction any kind of fraud.  Indeed, Defendants do not even

attempt to analyze these factors and apply them to the instant facts.  Nor do they cite to a case

where debarment is based on such an alter ego theory (there is none).

        In any event, it is clear that Canales is not a "wolf in sheep's clothing" using M Squared

as a fraudulent shield from personal liability.  While M Squared currently employs fifteen (15)

people, Canales (and two other employees) do no direct work on the government contracts

awarded to M Squared.[37]  Rather, Canales (and two other employees) are only involved in what

is referred to in government contracting as indirect cost matters for M Squared (otherwise

commonly referred to as overhead), such as administrative and marketing matters.[38] Ms. Canales

does not work directly on any government contract, and she does not directly supervise the work

of M Squared employees that do work directly on M Squared's government contracts.[39]  Thus,

Ms. Canales's current activities could not possibly affect the "present responsibility" of the

contractor, M Squared.  This "same person (Canales) in another form (corporate, M Squared)"

"alter ego" argument is **clearly foreclosed** by application of the provisions of FAR § 9.406-5(a).

Even if such a simple-minded analysis were permitted under the cited regulation, it would

nevertheless fail as a matter of undisputed fact as well as unambiguous law.

        Further, as this new "theory" was never asserted by the DO, it was never the subject of

any fact finding investigation by the DO or in any prior court action.  Indeed, this Court stated

that Defendants' argument on this issue:

                appear[s] sparse and incomplete at best; without a more thorough briefing and
                consideration of the issues Defendant raises, the Court is not in a position to
                find that there is a substantial likelihood that M Squared will not succeed on

---

[37]        Second Supplemental Declaration of Maria Canales, September 11, 2006, at ¶ 5, attached hereto as Exhibit
A.
[38]        *Id.*
[39]        *Id.* at  ¶ 6-7.

the merits.[40]

Notwithstanding the foregoing, even if Defendants' "alter ego" theory of debarment for M

Squared was legitimately culled from FAR § 9.406-5(a), which it was not, M Squared would be

entitled to a due process hearing on whether it was, in fact, the "alter ego" of Canales.  The

agency may not avoid such a procedure here, as there is no prior civil or criminal court decision

asserting, let alone holding, that M Squared is the "alter ego" of Canales.[41]

The requirement that, absent a prior conviction on the same basis as the debarment

action, a due process hearing is required is plainly stated in the Administrative Record.

Defendant Sharpe advised Plaintiffs' counsel:

> …48 C.F.R. § 9.406-3(b)(2), provides that agencies shall provide a contractor
> a right to appear in person in actions not based upon a conviction or civil
> judgment where the contractor's submission in opposition has raised a
> genuine dispute over material facts.  Since this proposed debarment is, in fact,
> based on a conviction, an opportunity to appear (*i.e.*, a "hearing") is not a
> component of the FAR process.[42]

However, contrary to Defendant Sharpe's summary statement in his Declaration ("Sharpe

Decl."), there is no court opinion, decision, conviction, or even any document presented by

Defendants in the Administrative Record, Debarment Notices, or affidavits that M Squared's

debarment is based on a prior court finding that it is the "alter ego" of Ms. Canales.

Thus, Defendants cannot now argue, post hoc, that M Squared is the "alter ego" of

Canales without, at a minimum, the actual assertion of such a claim, pre-debarment, and a due

process hearing at the agency level, pre-debarment.[43]  Defendants admit that the debarment of

Ms. Canales was based solely on her misdemeanor conviction.  However, there is nothing in the

record of that proceeding that alludes to, let alone sustains, any allegation that M Squared is the

---

[40]    Mem. Op. at pp. 11-12.
[41]    *See id.*
[42]    AR CAN at 0005.
[43]    *See Commercial Drapery Contractors v. U.S.*, 133 F.3d at 6.

"alter ego" of Ms. Canales.  It simply was never an issue in any proceeding previously (until Defendants filed their Motion).

In sum, Defendants' "post hoc" theory of debarment as to M Squared is without merit and should not be permitted to stand as a matter of law.  Even worse, Defendants' "alter ego" theory is a last minute futile attempt to substitute a wholly new ground for debarring M Squared in order to bolster the putative justification for the OIG's two false reports to Congress.  The debarment of M Squared is the very definition of a capricious act by the Government, and this Court should grant Plaintiffs' Motion for Summary Judgment as a clear matter of law on these undisputed facts.

> 2.  <u>There Can Be No Imputation of Debarment To M Squared Based Upon a Plain Reading of the Regulation Belatedly Relied Upon By Defendants</u>.

Even if the Court chooses to consider whether <u>FAR § 9.406-5(a)</u> applies in this case, it is apparent upon a plain reading of that regulation that, by its terms, it does not support imputing debarment to M Squared in any way, let alone imputing it on an "alter ego" theory.[44]  Instead, FAR § 9.406-5(a) applies to impute an individual's debarment to a corporate contractor **only when the conduct undertaken by the individual "*occurs in connection with the individual's performance of duties for or on behalf of the contractor, or with the contractor's knowledge, approval, or acquiescence*."** (emphasis added).

This Court agreed, and stated as one of the three reasons why Defendants' argument was "insufficient," that:[45]

> First, given that M Squared did not exist at the time of Canales's misdeeds, the plain language of FAR Section 9.406-5(a) suggests that there is real merit to M Squared's argument that its debarment was unlawful.[46]

---

[44]    Notably, nowhere in FAR § 9.406-5(a) does the term "alter ego" appear.  It is also noteworthy that the term "alter ego" does not appear in any other FAR provision cited by Defendants.

[45]    *Id.* at p. 11.

[46]    Mem. Op. at p. 11.

A second reason FAR § 9.406-5(a) cannot apply to M Squared is because the conduct at issue in

this case -- Canales's false writing in June 2002, while she was employed at Treasury, --  could

not have occurred in connection with Canales's performance of duties for or on behalf of M

Squared[47] (even if, arguendo, M Squared was in existence at that time, which it was not).

Thirdly, M Squared was first a government contractor (as a subcontractor) in April 2004, nearly

two years *after* the June 2002 false writing and *after* Canales pled guilty to making a false

writing in violation of 18 U.S.C. § 1018.[48]   Indeed, this Court recognized the truth of this

situation and stated:

> The Regulations provide that a corporate principal or agent's criminal or
> fraudulent conduct may be imputed to the corporation itself if such conduct
> 'occurred in connection with the individual's performance of duties for or on
> behalf of' the corporation or with its 'knowledge, approval, or acquiescence.'  Id.
> Here, however, **Canales's criminal conduct occurred while she was still an
> employee at Treasury, and thus before her career as a government
> contractor had begun and before M Squared had even been incorporated.
> That conduct therefore could not have occurred 'in connection with' the
> performance of duties related to M Squared or with its 'knowledge,
> approval, or acquiescence.'**[49]

Any other interpretation of FAR § 9.406-5(a) would be contrary to the plain and unambiguous

meaning of the cited regulation, and cannot, for that reason alone, be viable.[50]

---

[47]        *See* Plaintiffs' App. for PI at p. 3.
[48]        *Id.* at p. 4.
[49]        Mem. Op. at pp. 10-11 (emphasis added).
[50]        The plain meaning of the regulation should be given application.  *See District of Columbia Nat'l Bank v.
D.C.*, 348 F.2d 808, 810, 121 U.S. App. D.C. 196 (D.C. App. 1965) (stating that the plain meaning doctrine must be
given application, however hard or unexpected the particular effect, where unambiguous language calls for a logical
and sensible result.); *see also Seattle-First Nat'l Bank v. Conaway*, 98 F.3d 1195, 1197 (9th Cir. 1996) ("It is a well-
recognized rule of statutory construction that 'the plain meaning of the statute controls, and courts will look no
further, unless its application leads to unreasonable or impracticable results.'") (citations omitted); *Castillo v. Usery,
Sec. of Labor,* 1976 U.S. Dist. LEXIS 13151, *51 (N.D. Cal. 1976) ("Effect should be given to the natural and plain
meaning of words in a rule or regulations.") (citations omitted).

Certainly, had Congress intended for the "Scope of debarment" section of FAR[51] to apply to debar a contractor in a situation such as this one, where the principal of a contractor committed a crime outside the scope of her employment with that contractor, it would have provided for such a situation.  To the contrary, as discussed below, **FAR § 52.209-5(a)(2) treats such a situation as a disclosure issue only, *not* as the basis for an imputed debarment.**  FAR § 52.209-5(a)(2) provides that a principal of a contractor shall disclose any such past crimes on certifications submitted by a contractor during the solicitation process.  The prior misconduct of a principal of a government contractor is not a basis for debarment of the contractor; otherwise, the disclosure provision would be entirely superfluous.  Clearly, however, the FAR conspicuously does not provide for an imputed debarment on such grounds.

3.    The DO's Debarment of M Squared on an Imputation Theory under FAR § 52.209-5(a)(2) is Unlawful and Void.

Defendant Sharpe's Notice states that the *only* basis for the debarment of M Squared is that the debarment of Canales also applies to Canales's "place of employment in the event [Canales is] employed as a 'principal' as defined by the certification requirements under FAR § 52.209-5(a)(2)."[52] Thus, despite later protestations to the contrary, it is an established written fact that Defendant Sharpe debarred M Squared solely because Canales was a "principal" of M Squared under 52.209-5(a)(2).  Certainly, the Debarment Notice and the Administrative Record set forth no other basis for M Squared's debarment.

As explained in Plaintiffs' Reply in support of Application for Preliminary Injunction and Motion for a Temporary Restraining Order [Dkt. 25], FAR § 52.209-5(a)(2) merely provides the definition of what a principal is for the purposes of the certifications and disclosures required to

---

[51]    FAR § 9.406-5.
[52]    AR CAN 0011-0012.

be completed when bidding on a solicitation.  It does not provide an independent basis to impute

the debarment of Ms. Canales to M Squared.[53]  It reads:

> 2) "Principals," for the purposes of this certification, means officers; directors; owners;
> partners; and, persons having primary management or supervisory responsibilities within
> a business entity (*e.g.,* general manager; plant manager; head of a subsidiary, division, or
> business segment, and similar positions).

It then requires that certain disclosures be made of such principals.  Clearly, FAR § 52.209-

5(a)(2) does not provide any basis for debarment.  It appears that even Defendants now

acknowledge that reality, as they appear to abandon that argument as support for the DO's

debarment in their Motion.

It is undisputed that when M Squared has applied for government contracts, Canales

truthfully completed such certifications on behalf of M Squared and disclosed her misdemeanor

conviction.  Notwithstanding Canales's conviction and disclosure of the same, M Squared has

received multiple contracts from various federal agencies.[54]

For all of these reasons, Defendants' imputation theory fails, the debarment of M Squared

is wholly improper on the bases cited by the DO, and the debarment against M Squared is invalid

as a matter of law.  As there is no rational basis for the DO's decision, based on the regulations

or the new arguments in counsel's brief, this Court should grant summary judgment to M

Squared as a matter of law.

      **B.**      **Summary Judgment Should Be Granted For Plaintiff Canales As The Stated
Bases for Her Debarment Have No Rational Basis And Are Contrary to the
Applicable Regulations Since Canales Is Not, and Has Never Been, A
"Contractor" Within the Meaning of the FAR And Her "Conviction," Upon
Which Her Debarment is Solely Based,  Is Not For Acts That Occurred in
Connection with an Ongoing Procurement as Alleged by Defendants**

---

[53]      M Squared's App. for TRO at pp. 6-9.
[54]      Plaintiffs' App. for TRO at pp. 4-5.

The Court should grant Canales judgment as a matter of law because Canales is not a government contractor under the FAR, has never been a government contractor, and "[D]ebarment under FAR [§] 9.406-2, by its terms, applies only to a contractor."[55]  It is undisputed that only Canales's company, M Squared, contracts with the Federal Government.[56]  Notwithstanding this threshold issue, Defendant Sharpe maintained that, under FAR §§ 9.406-2(a)(1) and (5), cause for debarment of Canales existed because Canales was "convicted of violating [sic] U.S.C. § 1018, making a false writing in connection with an on-going procurement."[57]

That Canales is not a contractor under the FAR cannot reasonably be challenged, and, indeed, Defendants do not challenge this fact.  Rather, they simply conclude that Treasury can debar Canales without providing any justification for such a determination.  Not only is Defendants' Motion devoid of any consideration of whether Canales is a contractor under FAR, but so too is the Administrative Record.  Similarly, Defendants' Motion fails to address the undisputed fact that neither Canales nor M Squared has ever had a government contract with the Department of Treasury, and, as such, there is no justification for Treasury's assumption of jurisdiction to debar her (or M Squared, for that matter) at all.

However, even if the Court determines, *arguendo*, that Canales is a contractor within the definition of that term provided by FAR, because Defendants base the debarment of Canales on a crime that Canales did not commit, her debarment cannot stand.  In the Notice of Debarment, Defendant Sharpe stated that the cause for the debarment of Canales was her conviction for making a false writing in connection with an ongoing procurement.[58]  As explained *supra*, the

---

[55]  *Caiola*, 851 F.2d at 400.
[56]  Canales Aff., attached as Exhibit 1 to Plaintiffs' Motion for Reconsideration [Dkt. No. 5].
[57]  AF CAN 0011.
[58]  *Id.*

official records of this District Court clearly show that Canales was not convicted of any crime that related to an ongoing procurement.[59]

The determinations by the DO and the OIG that Canales was "convicted of violating U.S.C. § 1018 [for] making a false statement in connection with an ongoing procurement" and that she "directed a consulting firm under contract with the Department to secure a $1.5 million subcontract with a company owned by the CIO's friend, as part of (or in exchange for), a $5.8 million contract that Treasury awarded to the consulting firm [and] accepted various gratuities including jewelry and the use of a time-share rental property," respectively, are demonstratively false. The U.S. Attorney's Office flatly stated that the § 1018 misdemeanor conviction was not related to any procurement actions and that there is "no allegation Ms. Canales broke any of the bribery or gratuity laws or corruption offenses."[60] Accordingly, the debarment decision was based on a misreading, whether negligent or intentional, of the official Court Record of Ms. Canales' criminal proceeding and its ultimate outcome.

Further, even if the opposite were true (it is not), even then this Court recognized that Defendants' theory could not stand, when it stated:

> Canales's criminal conduct occurred while she was still an employee at Treasury, and thus before her career as a government contractor had begun and before M Squared had even been incorporated.[61]

The only possible explanation for Defendants' failure to understand the clear statements made in the United States District Court two time, in 2004 and their repeated refusal to acknowledge the fact that the criminal conduct underlying the conviction upon which the debarment is based was not based on any ongoing procurement and, in any event, occurred

---

[59]     *See* discussion *supra* at pp. 8-9 regarding U.S. Attorney Sklamberg's statement distinguishing Canales's conviction for making a false writing from any crime relating to bribery, gratuities or corruption statutes.
[60]     AR CAN 0133 and 1044-1045.
[61]     Mem. Op. at p. 11.

*before* she even entered the government contracting arena -- is that the OIG and the DO are

acting in furtherance of a capricious vendetta against Ms. Canales that began with the OIG's first

false report to Congress and continues to this day.

As this Court stated, "debarment may be imposed 'only in the public interest for the

Government's protection and not for purposes of punishment.'"[62] Clearly, debarment for the

Government's protection and in accordance with its regulations did not occur in this case.

Regardless, because the debarment against Canales relies on the premise that Canales committed

a crime that, in reality, she did not commit, the debarment is arbitrary, capricious, contrary to

law, and cannot stand. Consequently, this Court should strike the debarment against Canales,

deny Defendants' Motion, and grant Plaintiffs summary judgment as a matter of law.

> **C.      This Court Should Grant Plaintiffs Summary Judgment and Deny Defendants' Motion On The Independent Grounds That, as Defendants' Debarment of Both Plaintiffs Is Based Upon Unlawful Considerations, With No Basis In Law, As Evidenced By the Complete Ignorance of, or Intentional Disregard for, the Official Records of Proceedings in Canales's Misdemeanor Conviction Case in the United States District Court.**

Defendants' debarment of Canales, by which Defendants impute debarment to M

Squared, lies on a clearly faulty premise - - a conviction for "making a false writing in

connection with an ongoing procurement." [63] From 2004 through the present date, Defendants

have consistently ignored the undisputed evidence contained in the Administrative Record: the

U.S. Attorney's Office did *not* find Canales guilty of violating *any* bribery or gratuity statutes or

committing any corruption offense in connection with an ongoing procurement.[64] While

Defendants correctly assert that Canales pled guilty for a "false writing" during her employment

---

[62]      Mem. Op. at p. 10.
[63]      AR CAN 0011.
[64]      AR CAN 0133 and 0144-0145.

at Treasury, Defendants' Motion[65] notably omits the salient fact that her conviction was *not* for a false writing in connection with an ongoing procurement in violation of procurement regulations or bribery or gratuities or corruption statutes or any other felony. This critical distinction was clearly and specifically explained by AUSA Sklamberg. Once at Canales's arraignment and a second time at her sentencing hearings.[66]

A Memorandum of Activity in the OIG report (which is part of the Administrative Record) lists all of the allegations for which the Treasury OIG investigated Canales;[67] however, Defendants never admit, certainly not in the Debarment Notices or in their papers filed in this Court, what they all know to be undisputedly true: the U.S. Attorney's Office found no basis upon which to prosecute Canales for any of these allegations. AUSA Sklamberg also made it very clear two wholly separate times on the record before United States Magistrate Judge Robinson that the only false writing made to OIG personnel, regarding a gift of emerald chips from a long-time friend valued at $800, did not relate in any way to any procurement, bribery, gratuity, or corruption statutes or activity.[68]

Clearly, the DO ignored the findings and statements of the Assistant U.S. Attorney at Canales's arraignment and sentencing hearings even though the transcripts of those hearings *are part of the Administrative Record.*[69] At the Arraignment Hearing on April 19, 2004, AUSA Sklamberg gave a proffer of what the evidence would have shown had the case gone to trial.[70] After his proffer, Canales's counsel noted, "there is no connection proffered by the United States Attorney's Office that connects any procurement to those gifts."[71] When asked to respond by the

---

[65]     *See* Defendants' Motion at pp. 3 and 13.
[66]     *Id.*
[67]     AR CAN 0085.
[68]     AR CAN 0133 and 0144-0145.
[69]     AR CAN 0121-0153.
[70]     AR CAN 0129-0133.
[71]     AR CAN 0133.

judge, AUSA Sklamberg stated: "[T]his is a plea to Section 1018 *and we're not alleging a violation of the bribery or gratuity statute*, so that statement I think does not detract from the factual proffer."[72]  Then, on July 13, 2004, at Canales's Sentencing Hearing, AUSA Sklamberg stated:

> As the Court knows from reviewing the actual proffer upon which the parties agreed, this case stems from an investigation by the Inspector General's Office into activities by Ms. Canales.  ***There ended up being no allegation that Ms. Canales broke any of the bribery or gratuity laws or corruption offenses.***
>
> In the course of the investigation, however, Ms. Canales made a false written statement to the Inspector General…That false statement forms the basis, the false written statement, forms the basis to the misdemeanor to which Ms. Canales pled.[73]

Defendants now unequivocally admit that the statement in the April 2004 and October 2004 SARs - that Canales was "barred for life" from doing business with the Federal Government following her misdemeanor guilty plea – is "erroneous."[74]  While Defendants argue that the blatantly false reports *only* had to do with the "relatively minor" issue of stating that Canales was debarred from contracting with the federal government for life, they clearly miss the point.  Not only are the statements defamatory and inflammatory, they are absolutely untrue - - *Canales had not been debarred at all when the SARs were published*.  In fact, no debarment proceedings had even been initiated by 2004.[75]

Nevertheless, Defendants allegedly have no idea how two SARs, six months apart, unequivocally stated that Canales had been "debarred from doing business with the federal government for life" as part of her 18 U.S.C. § 1018 guilty plea.  They then seek to further downplay their conduct by stating that, subsequently, she was debarred for three years and that

---

[72]        *Id.* (emphasis added).
[73]        AR CAN 0144-0145.
[74]        Defendants' Motion at pp. 3 and 6.  *See also* Exhibits C and D to Plaintiffs' Complaint.
[75]        Sharpe Decl. at ¶ 3.

they will correct the "erroneous" information in the 2004 SARs by a correction in their next SAR to reflect this year's three-year debarment.[76]

The first false SAR to Congress was published on April 30, 2004, *subsequent* to the arraignment hearing (April 19, 2004), and the OIG published the second false SAR on October 29, 2004, well after both the arraignment hearing *and* the sentencing hearing (July 13, 2004). The OIG simply chose to ignore the AUSA's official and public record of the conclusion of the criminal investigation of the OIG allegations. Instead, they published the false SARs as if to change the result of the AUSA's investigation and resolution of the matter.

This further false implication, that Canales's conviction was based on procurement fraud rather than for a single misdemeanor offense *unrelated* to procurement fraud, bribery, or gratuities, when the AUSA affirmatively stated the opposite, wended its way into the Debarment Notice as the basis for debarment. The Debarment Notice states: "You were convicted of violating 18 U.S.C. § 1018, making a false writing in connection with an ongoing procurement."[77] On its face, the Debarment Notice <u>ties</u> the false writing to procurement fraud despite the fact that the Department of Justice investigated the matter and found no nexus whatsoever between the false writing and any procurement decision .. Accordingly, the conviction serves as an improper basis upon which to base the debarment of both plaintiffs, and this Court should grant Plaintiffs' Motion, and deny Defendants' Motion, since, as a matter of law, there was no valid basis to debar either Plaintiff..

Defendants additionally, cavalierly assert that the OIG's two false reports to Congress regarding the basis for Canales's plea and conviction did not affect Canales or M Squared

---

[76]     Defendants' Motion at p. 3.
[77]     AR CAN 0011.

because M Squared still obtained government contracts.[78]  This argument is unavailing.  While

M Squared obtained government contracts in the latter half of 2004, the SARs only mention

Canales, not M Squared, and Canales is not the government contractor, only M Squared is a

government contractor.  More significantly, both Canales and M Squared have been debarred on

the same false assumptions found in the SARs and the DO's debarment decision.  Finally, the

ability of M Squared to obtain government contracts and the ability of any company that

employs Canales to obtain government contracts, in the future has been impaired by the stigma

of the false accusations and debarments based on those false criminal accusations.  It is high time

this public record was corrected.

> **D.**   **This Court Must Further Independently Deny Defendants' Motion for Summary Judgment As It Sets Before the Court Documents and Representations That Were Not Part of the Administrative Record of the Plaintiffs' Debarment, and Because Plaintiffs Have Had No Opportunity For Discovery On These New Matters.**

Defendants claim, by affidavit, that Treasury received two emails in August 2005,

questioning the veracity of the SARs about Canales and her alleged lifetime debarment.[79]

Incredibly, these emails, and the responses to them, *are not in the Administrative Record*.

Rather, they are attached to Mr. Delmar's Affidavit as Attachments A through C.  The

submission of such documents, absent from the Administrative Record upon which the

debarment is *supposed* to be based, mandates that this Court deny Defendants' Motion because it

is based on documents and affidavits that were not part of the record underlying the debarment.

Indeed, the very submission of these documents is a tacit admission by Defendants that, based

solely on the Administrative Record, Defendants' debarment of Plaintiffs is indefensible.  This

---

[78]     Defendants' Motion at p. 7.
[79]     Defendants' Motion at pp. 6-7.

Court must also deny Defendants' Motion because Plaintiffs had no opportunity to take any discovery regarding these new documents presented by Defendants.

Further, the submission in Defendants' Motion of this new evidence only supports Plaintiffs' Motion for the invalidation of the debarment of Plaintiffs. Inexplicably, the OIG never corrected the SARs in 2005 even though the OIG represented to the inquirers that it would correct the record. Having actual (and now admitted) notice in August 2005 that they had published false reports to Congress, Defendants should have retracted the false statements in the October 2005 and/or in the April 2006, semi-annual reports to Congress. However, they failed to do so. Rather, instead, they accelerated their efforts to get the DO to institute a debarment proceeding and issue a debarment notice. The only plausible reason for this conduct -- that which Plaintiffs have been propounding since the inception of this lawsuit – is that the debarment of Canales and M Squared rests on an impermissible basis, which is to punish Canales for acts she allegedly committed as a Treasury employee and to protect the reputation of the involved OIG officials. Accordingly, the OIG would not correct (and has yet to correct) the erroneous SARs regarding "lifetime debarment" until he could persuade the DO's attorney to get the DO to at least issue a three-year debarment.

Since the U.S. Attorney's Office refused to find that Canales committed procurement fraud, Defendants are punishing her the only way they can – by ruining her business. It is unbelievable that now, more than one full year after they admit they were aware of the false reports to Congress in April and October 2004, and after two prior missed opportunities to correct their false statements in the October 2005 and April 2006 SAR, respectively, Defendants state that they will only *now* correct their "error."[80] Since the truth of these two SARs were first questioned, rather than correcting those admittedly and blatantly false statements in the October

---

[80]     Defendants' Motion at p. 6.

2005 and April 2006 SAR, Defendants instead initiated the proceeding to debar Canales to "backfill" their misconduct.  This constitutes shameful and flagrant government misconduct.

Further, while Defendants claim that Mr. Sharpe was unaware that the SARs to Congress were false and that he did not, in any event, consider the SARs when he determined to debar Plaintiffs,[81] *his lawyer certainly had knowledge of the false SARs.*[82]  Indeed, there appears to have been through a "Vulcan Mind Meld" between the Treasury OIG's lawyer and the Treasury DO's lawyer worthy of any Star Trek episode.[83]  After the OIG's counsel, Richard Delmar *stressed the need for fast action* on Canales's debarment to Bill Murphy, the DO's counsel on September 7, 2005,[84] Mr. Delmar's  assistant, Clifford L. Brown, Jr. apparently followed up on the OIG's counsel's request on January 11, 2006, and planned a further contact to obtain the "fast action" on Canales's debarment on February 6, 2006.  The handwritten communication stated: "per Clif – 1/11/06 – open debarment 11/29/05 proposal check @ end Feb 06."[85]  These documents raise serious questions regarding the DO's (untested by any discovery) claim that he was not aware of the OIG's false statements to Congress and, by implication, the OIG's post-hoc efforts to "speed-up" debarment proceedings against Ms. Canales at the time he made his decision.  These claims ring hollow in light of the newly produced e-mail between their respective counsel on this same issue and the fact that they both published the same false statement:  that Ms. Canales had been debarred for conviction of a criminal offense in connection with ongoing government procurement!

---

[81]     Defendants' Motion at pp. 7 and 17; Sharpe Decl. at ¶ 6.

[82]     *See*, Attachments A through C to Mr. Delmar's Affidavit.

[83]     Delmar Aff., Attachment C.  (emphasis added).

[84]     *See*, Attachments C to Mr. Delmar's Affidavit.

[85]     *See*, Attachment 1 (unredacted) to Notice of Filing:  Supplemental Documents to the Richard Delmar Affidavit, filed on August 28, 2006 [Dkt. No. 23].

In Defendants' Motion, they reveal for the first time that the OIG's counsel, Mr. Richard K. Delmar, received an inquiry regarding the accuracy of the statements in the OIG's October 2004 SAR in connection with a pending FOIA request.  He received this email inquiry on August 9, 2005 at 11:28 a.m. from David Perera, Senior Reporter, Federal Computer Week.[86] By 11:48 a.m., only 20 minutes later, Mr. Delmar informed Mr. Perera that the statement in the SAR concerning the lifetime debarment of Canales was inaccurate.[87]

Next, Mr. Delmar states that he received a second inquiry, an email from John Breslin to the OIG Hotline on August 25, 2005, reporting that, if the statement regarding Canales's lifetime debarment in the OIG's March 2004 SAR is true, Canales is violating her plea agreement as she has a lucrative contract with a federal agency.[88]  A Clifton Brown, Jr. (a Treasury OIG official whose position is unidentified by Defendants) responded to Mr. Breslin, stating that,

> "the Treasury OIG did report that the subject had been debarred for life; however, this statement was made in error.  The subject's conviction was reported to the Department of Treasury for appropriate action, which can include suspension or debarment.  We will bring the information provided to the attention of the appropriate department officials."[89]

On that same day, September 7, 2005, approximately 2½ hours after Mr. Brown's e-mail to Mr. Breslin, the OIG's counsel, Mr. Delmar, reported to his OIG colleagues that he talked directly to Bill Murphy, the DO's counsel, and "forwarded this email package to him, *stressing the need for fast action. We'll see...*"[90]  This communication or meeting was clearly outside the established channels of communication between the OIG and the DO.[91, 92]  Moreover, the email exchange

---

[86]    Delmar Aff.,  Attachment A.
[87]    *Id.*
[88]    Delmar Aff., Attachment B.
[89]    *Id.*
[90]    Delmar Aff., Attachment C.  (emphasis added).
[91]    *See* Declaration of Mr. Thomas A. Sharpe Jr. ("Sharpe Decl.") at ¶ 1 and Delmar Aff. at ¶ 2-3.
[92]    These newly released communications, which are not in the Administrative Record, raise a number of very serious and troubling questions.  First, why is OIG's counsel, Mr. Delmar, having a "lawyer-to-lawyer" communication with the DO's attorney, Bill Murphy, outside the established channels of communication?  Second, why is Mr. Delmar discussing the SARs with the DO's attorney?  Third, why is Mr. Delmar telling the DO's

demonstrates that the OIG was putting the full court press on the DO to move forward with the debarment, which was clearly result oriented.

Rather than correcting the false reports to Congress, on November 29, 2005, more than nineteen (19) months after the OIG first publicly announced in April 2004 Canales's "Life-Time Debarment" and conviction for ongoing procurement fraud but only a little more than two months after OIG's counsel, Mr. Delmar, "[stressed] the need for fast action" to Bill Murphy, the DO's counsel, Treasury informed Canales, for the first time, that it was initiating debarment proceedings against her.[93]

The use of email communications veiled in attorney-client privilege between counsel for Treasury DO and counsel for the Treasury OIG speaks volumes. Since Defendants produced this new information for the first time in their Motion, it would be the height of injustice to ask the Court to consider this "new evidence" while simultaneously asking the Court to deny Plaintiffs any discovery on these new documents and affidavits. This is especially so when it is highly questionable whether it is within the scope of the OIG's responsibilities to be involved at all in debarment proceedings, let alone lobbying for a particular result.[94]

The Sharpe declaration, Delmar Affidavit, and Defendants' emails between OIG and Treasury DO speak for themselves and demonstrate, on their face, that the debarment of Canales and M Squared was arbitrary, capricious, and instituted for improper purposes such as to punish Canales and then clean up the OIG's false and defamatory statements to Congress. Such actions

---

attorney that he "need[s] fast action" from the DO? Fourth, if there is any legitimate basis for this communication between independent units of Treasury, why are these communications not made through official channels such as the line of communication set forth in the OIG's September 30, 2004 Report of Investigation ("ROI")? Fifth, why is the referenced follow-up email between attorneys Delmar and Murphy not produced?

[93]    AR CAN 0014-0015.

[94]    *See generally Burlington N. R.R. Co. v. Office of Inspector General*, 767 F. Supp. 1379, 1387-89 (N.D. Tex. 1991) (discussing the scope of the OIG's responsibilities and stating that "[t]he Inspectors General to be appointed by the President with the advice and consent of the Senate will first of all be independent *and have no program responsibility* to divide allegiances…").

should not be allowed to stand, and this Court should grant summary judgment to Plaintiffs as a matter of law.

## **CONCLUSION**

WHEREFORE, for the aforementioned reasons, Plaintiffs respectfully request that this Court issue an order:

1. Granting Plaintiffs' Cross Motion for Summary Judgment;

2. Awarding Plaintiffs' reasonable attorneys' fees; and

3. Awarding any other relief to Plaintiffs that this Court finds just and proper.

DATED: September 11, 2006

Respectfully submitted,


__/s/__ Steven D. Cundra_____
By:  One of their attorneys
Steven D. Cundra, D.C. Bar No. 374074
Amy Epstein Gluck, D.C. Bar No. 453525
Nicholas M. Beizer, D.C. Bar No. 485894
**HALL, ESTILL, HARDWICK, GABLE,**
**GOLDEN & NELSON, P.C.**
1120 20th Street, N.W.
Suite 700, North Building
Washington, D.C. 20036
(202) 973-1200
(202) 973-1212 (fax)
*Attorneys for Plaintiffs*